# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Walker*, 2012 IL App (1st) 083655

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FREDERICK WALKER, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-08-3655 |
| Filed | June 12, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree murder, aggravated criminal sexual assault and home invasion were upheld where any error by the trial judge in sentencing did not prejudice defendant, there was no indication defendant did not understand his *Miranda* rights, despite his limited mental capacity, and there was no evidence other than his testimony to support his claim that his inculpatory statement was coerced. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 00-CR-18073; the Hon. James Michael Obbish, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |

| Counsel on Appeal | Abishi C. Cunningham, Jr., Public Defender, of Chicago (Robert C. Drizin, Assistant Public Defender, of counsel), for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. |
| | Presiding Justice Quinn and Justice Cunningham concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant, Frederick Walker, appeals his conviction after a jury trial on three counts of first degree murder, two counts of aggravated criminal sexual assault, and one count of home invasion, and his sentence of imprisonment for natural life. On appeal, Walker contends he was denied a fair trial and sentencing hearing because (1) the trial court mistakenly believed it had to sentence Walker to either death or natural life imprisonment, and it considered improper factors in his sentencing; (2) his statement should have been suppressed where he had established that his ability to waive his *Miranda* rights was compromised by his impaired mental abilities, and he testified that a detective had threatened him with a gun into making the statement; (3) the trial court erred in allowing the State to present other crimes evidence; (4) the trial court erred in denying his motion to quash his arrest and suppress evidence where the police had no probable cause to arrest him; (5) the trial court erred in admitting the testimony of forensic expert Debora Depcynzski and in barring the impeachment of State witness Amy Rehnstrom related to her involvement in a theft; and (6) cumulative error requires reversal. Walker also argues that his mittimus should be corrected to reflect only one conviction for first degree murder and one conviction for aggravated criminal sexual assault. For the reasons stated below, we affirm Walker's conviction on one count of first degree murder, one count of aggravated criminal sexual assault, and home invasion. The mittimus should be corrected accordingly.

¶ 2                                              JURISDICTION

¶ 3    The trial court sentenced Walker on December 15, 2008, and he filed a timely notice of appeal on December 16, 2008. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

¶ 4                                    BACKGROUND

¶ 5        On June 22, 2000, the police discovered the body of Dorothy Shorty in her home at 7144 South Oakley in Chicago, Illinois. After speaking with a neighbor and with Shorty's daughter, Brenda, the police issued an investigative alert for Walker. On June 24, 2000, Walker entered the 11th District police station on an unrelated matter hereinafter described and was subsequently arrested. Walker gave an oral statement, which was recorded on videotape. The State filed an intent to seek the death penalty.

¶ 6        The State filed a motion *in limine* to allow evidence of other crimes. First, the State sought to introduce evidence that Walker burglarized Shorty's home on June 12, 2000, approximately eight days before her murder. Walker admitted in his statement that he had burglarized Shorty's home before her murder, but he later alleged that his confession was coerced. The State argued that the evidence was relevant to establish motive for murder, intent, hostility toward the victim, and the voluntariness of Walker's confession. Walker argued that the burglary was remote and could confuse the jury. Second, the State sought to introduce evidence of events leading up to Walker's arrest at the police station. Specifically, Walker came to the station, allegedly hit a woman, and got into an altercation with police after which he was arrested. The State argued that the evidence rebutted Walker's claim of mistreatment by the police at the station and showed a guilty conscience because he resisted arrest. Walker had asserted in his statement that the police came toward him, kneed him, and sprayed him with mace. Judge Simmons granted the motion, finding that the probative value of the evidence outweighed its prejudicial impact.

¶ 7        On October 24, 2008, Judge Obbish, who had taken over the case after the retirement of Judge Simmons, presided over a motion *in limine* filed by the defense to bar the State from introducing the other crimes evidence previously ruled admissible by Judge Simmons. Judge Obbish determined that the prior ruling was the law of the case, and in reviewing the evidence, he agreed with the ruling and allowed admission of the evidence.

¶ 8        Walker also filed motions to suppress his statement and to quash his arrest and suppress evidence, specifically clothing and DNA evidence. Walker argued that he was not advised of his rights, his right to remain silent was violated, and his statement was coerced. He testified at the hearing that a gun was held to his head prior to his giving the statement and he did not understand his rights because he read only at a fourth-grade level and no one read the forms to him. Detective Turner testified at the hearing that he was present when Walker gave his statement and to his knowledge no one threatened Walker. Detective Turner stated that when he was in the room with Walker, he did not have a gun in his holster because in most cases he does not go into an interview room armed with a weapon. He also explained the consent forms for taking DNA to Walker and gave him a chance to read the forms. Walker never conveyed that he did not understand he was consenting to give samples of his DNA. The trial court denied the motions.

¶ 9        Walker subsequently obtained new counsel, and they sought to reopen the motion to suppress his statement arguing that Walker was not mentally competent to understand his *Miranda* rights. They also sought an *Atkins* hearing (*Atkins v. Virginia*, 536 U.S. 304 (2002)) to determine whether Walker could be considered mentally retarded. His counsel called Dr.

Michael Gelbort, a clinical psychologist, to testify. Dr. Gelbort determined that Walker's overall score on an IQ test was 80, which is between "mentally defective range" and "low-average range" of functioning. His verbal score was a 78, which he opined was the most indicative of a person's ability to function in society. His reading was at a fifth-grade level. None of the scores, however, fell into the mental retardation range.

¶ 10    Dr. Gelbort further testified that Walker "in a very, very gross or superficial fashion" could understand words and have a very general understanding of sentences, but his ability to understand the overall concepts of *Miranda* warnings was "defective." However, Dr. Gelbort acknowledged that he never asked Walker how many times he had heard *Miranda* warnings. He also stated that although he was familiar with the *Atkins* standard for determining mental retardation, he did not evaluate Walker to see if he met the criteria because he did not have enough information to do so.[1] The trial court granted the State's motion for a directed finding that Walker did not meet his burden in establishing that he was mentally retarded under *Atkins.* After the directed finding, the State decided not to present its expert on the subject, Dr. Coleman.

¶ 11    Regarding the *Miranda* issue, Assistant State's Attorney (ASA) Allan Murphy testified at the hearing that he met with Walker on June 24, 2000, at the police station and spoke to him first in the presence of Detective Turner and then alone. When he first spoke to Walker, he had been in custody about 15 hours. He introduced himself as a prosecutor and read Walker his *Miranda* rights. He said he understood his rights and was coherent and responsive. Walker stated that the police had treated him well and the only problem was with how they treated him when he was first arrested. He told ASA Murphy that the officers hit him, kneed him, "jumped on him" and put mace in his eyes. ASA Murphy stated that he did not see any physical injuries on Walker.

¶ 12    ASA Murphy testified that Walker agreed to have his statement videotaped. He read the form to Walker, and Walker signed the consent form. In the videotape, Walker was again advised of his *Miranda* rights and stated that he was treated well while in custody. When asked if Detective Turner or ASA Murphy had mistreated him, Walker said no. He never stated that anyone threatened him with a gun. The trial court denied Walker's motion to suppress his statement, finding after viewing the videotape twice that the statement was voluntarily, knowingly, and intelligently made.

¶ 13    In March 2008, Walker was found unfit to stand trial and he was remanded to the Department of Health and Human Services. He returned to Cook County jail on May 29, 2008. The trial court conducted another fitness hearing in October 2008. Dr. Chapman testified that he interviewed Walker six to eight times and opined that he was unfit to stand trial. However, his fitness could be restored with proper medication.

---

[1]In *Atkins v. Virginia*, 536 U.S. 304, 318 (2002), the United States Supreme Court voiced concern about criminals with diminished capacities and their culpability in committing crimes. It determined that although a defendant's mental deficiencies do not exempt him from criminal sanctions, they do diminish his personal culpability. *Id.* Therefore, it held that the death penalty "is not a suitable punishment for a mentally retarded criminal." *Id.* at 321.

¶ 14 At the October 2008 fitness hearing, Dr. Nadkarni testified that he also interviewed Walker and that he understood the legal proceedings and gave articulate responses. Dr. Nadkarni "wanted to make sure that [Walker] was able to assist counsel in his defense." Walker, in fact, "indicated his desire to do so" and Dr. Nadkarni believed he could effectively assist in his defense. Dr. Nadkarni also reviewed summaries of examinations conducted by forensic clinical services staff, Walker's medical records, police reports, criminal history reports, outside evaluations done by psychiatrists, and handwritten motions Walker filed with the court. He also performed a general psychiatric evaluation of Walker and determined that he "does not manifest a primary Access 1 psychiatric disorder nor debilitating cognitive impairment." Instead, in his opinion Walker "manifests a severe anti-social personality disorder." He did not believe Walker required medication to maintain his fitness or functioning. Dr. Nadkarni opined, within a reasonable degree of medical and psychiatric certainty, that Walker was fit to stand trial. The trial court found Walker fit to stand trial.

¶ 15 At trial, Eva Bass testified that on June 20, 2000, she was getting ready for work around 5:30 a.m. when she went outside and saw a man she had never seen before standing in front of Shorty's house. The man wore dark jeans and a white shirt, and his hair was in a ponytail. He cracked open the door of Shorty's house and called, "Momma, what did you say you wanted from the store?" He then turned and acted like he was locking the door. Mildred Neal testified that she was leaving for work that day around 7:30 a.m. when she saw Walker coming out of Shorty's house. He wore a white T-shirt and dark jeans, and his hair was in a ponytail. She recognized him because he had dated Shorty's daughter, Brenda, when Brenda lived at the house.

¶ 16 Detective Alan Szudarski was assigned to investigate Shorty's death and went to her house on June 22, 2000. He observed that the house had been ransacked, and Shorty's body was on the floor facedown in the dining room. The blade of a knife protruded from Shorty's neck. She was naked from the waist down and wore only a camisole and bra. Shorty's undergarments were placed on a bedpost in the bedroom. There was blood on the bedsheets, and blood in the dining room and kitchen. In the bathroom, it appeared someone tried to clean up. There were no signs of forced entry into the house. After speaking with Shorty's neighbors and Brenda, Detective Szudarski issued an investigative alert for Walker.

¶ 17 Lieutenant Broderick testified that he was working the front desk at the 11th District police station around 1 a.m. on June 24, 2000. Two women were talking to the desk sergeant when Walker came in and punched one of the women in the face. Officers moved toward Walker and he started swinging his fists. The officers subdued him and took him to the lockup. They learned there was an investigative alert for Walker and contacted Area 1 detectives. Walker was transported to Area 1, where detectives brought him to an interview room and read him his *Miranda* rights. Walker stated that Shorty was his mother-in-law, but denied knowing anything about her murder. He agreed to turn over clothing as possible evidence.

¶ 18 Detective Turner testified that he met with Walker in an interview room around 7:30 a.m. on June 24, 2000. He advised him of his *Miranda* rights and asked if Walker knew anything about what happened to Shorty. Walker responded, "Yeah, I killed her." He further stated

that he went to Shorty's house around 5:30 a.m. on June 19 or 20 looking for Brenda and their son. He asked Shorty where they had moved, and she would not give him that information. She did offer to take his information and pass it on to Brenda. When she cracked open the door to give him a pen and paper, Walker pushed the door and entered the house. He saw that Shorty was holding a knife so he put her in a choke hold. He then took the knife and stabbed her in the neck. The handle of the knife broke off as he stabbed her. Shorty was moaning and Walker knew he had to "finish her off" because she would tell someone what he had done. He retrieved another knife from the kitchen and stabbed Shorty repeatedly. He denied that he had sex with her. He stated she was naked from the waist down because she had urinated on herself and he allowed her to take off her panties and hose, which she then threw on the bedpost.

¶ 19    Walker stated that he tried to clean up in the bathroom and he put on a clean shirt from Shorty's closet because he was bleeding. When he left the house, he saw a woman outside. He did not want her to think anything was wrong so he called back into the house asking Shorty if she needed anything from the store. He then went inside, retrieved Shorty's keys from her purse, and locked the door.

¶ 20    Walker also stated that he had burglarized Shorty's house on June 12, 2000, and he cut his arm when he broke into her house. Since he had lived with her before, he knew where she kept money. He waited for her to leave for work before breaking in and taking $2,300 in cash. He later went to the hospital to treat his cut. At trial, Dr. Constance Green testified that someone named Frederick Walker was treated at Stroger Hospital on June 12, 2000, for a laceration on his right arm. The cut was consistent with being cut with broken glass.

¶ 21    Walker also spoke about his altercation with police. He stated that he had gone to his mother's house and knocked on her window. When she did not let him in and threatened to file a complaint against him for breaking her window, Walker became angry and went to the police station. At the station, he argued with his mother and then got into a physical altercation with the officers.

¶ 22    Detective Turner testified that Walker signed a form consenting to the collection of DNA samples from him. ASA Murphy spoke with Walker on June 24, 2000, and Walker consented to give a videotaped statement. The videotaped statement covered substantially the same material as the statement Walker had given to Detective Turner.

¶ 23    Walker's sister, Deborah, testified that she spoke with him over the phone on June 23, 2000. She asked him if he killed Shorty and he responded that he was trying to get information about his son and he became upset because he believed Shorty was withholding information from him. He told Deborah that he went into Shorty's house and stabbed her in the throat.

¶ 24    Dr. Scott Denton performed the autopsy on Shorty. He found signs of strangulation, blunt trauma to the side of the head, scrapes, abrasions, and stab wounds to the neck and chest. He recovered a portion of a knife blade from her neck. He determined that the cause of death was strangulation and multiple stab wounds, and the manner of death was homicide. He also took a blood sample from Shorty and took buccal swabs of her vaginal and rectal areas.

¶ 25    Amy Rehnstrom testified as an expert in the field of DNA analysis. She analyzed the

blood standard taken from Shorty, as well as the bloodstains taken from Walker's clothing. Bloodstains from Walker's shoes and shirt, and one from his jeans, were consistent with having come from Walker. One of the stains from his jeans matched the blood standard taken from Shorty. Rehnstrom also analyzed the vaginal swabs and determined that the semen contained on those swabs were consistent with Walker's DNA.

¶ 26    The State rested and Walker called one witness, Dr. Gelbort. He testified that Walker scored a full-scale IQ of 80, a verbal IQ score of 78, and a performance IQ score of 86. His reading, spelling, and math scores were between the second and sixth grade levels placing him in a range below the fifth percentile. When asked simple, concrete questions Walker could perform at a low-average range. However, he would have difficulty if asked to respond to more comprehensive questions. On his best day, in optimum circumstances, Walker could have a "semblance of an understanding of what *Miranda* is asking him," but under adverse conditions his comprehension and ability to use reasoned judgment would be impaired.

¶ 27    The jury found Walker guilty of one count of intentional first degree murder, two counts of felony murder, two counts of aggravated criminal sexual assault, and one count of home invasion. The trial court found Walker eligible for the death penalty on the grounds that the murder occurred during the course of two felonies. Walker waived his right to a jury for the death penalty hearing. After hearing evidence in aggravation and mitigation, the trial court declined to impose the death penalty and sentenced Walker to natural life imprisonment. Walker then filed a motion to reconsider his sentence, which the trial court denied. Walker filed this timely appeal.

¶ 28                                   ANALYSIS

¶ 29    Walker first contends that he did not receive a fair sentencing hearing because the trial court considered improper factors when it sentenced him to natural life imprisonment. Walker has forfeited review of this issue by failing to object at the sentencing hearing and failing to include the specific issue in a posttrial motion. See *People v. Kitchen*, 159 Ill. 2d 1, 42-43 (1994) (upon review of a sentencing hearing involving the death penalty, an issue is waived if defendant failed to object at the hearing or specifically include the alleged errors in a posttrial motion). Walker urges this court to review his argument as plain error. The plain error doctrine applies where the evidence is closely balanced, or when "the error is of such magnitude that it deprived defendant of a fair trial." *Id.* at 34. However, "[t]he first step of plain-error review is to determine whether any error occurred." *People v. Lewis*, 234 Ill. 2d 32, 43 (2009).

¶ 30    The trial court is granted great deference in sentencing a defendant and a reviewing court will not overturn the trial court's determination absent an abuse of discretion. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). However, if the sentencing judge relies on an improper factor or makes comments indicating he did not consider the statutory factors, a defendant is entitled to a new sentencing hearing. *People v. Primm*, 319 Ill. App. 3d 411, 425 (2000). Even if the sentencing judge considered an improper factor, remand for resentencing is necessary only if the consideration resulted in a greater sentence. *People v. Bourke*, 96 Ill. 2d 327, 332 (1983). In determining whether the trial court improperly imposed a sentence,

this court will not focus on isolated statements but instead will consider the entire record. *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986). A sentence that falls within the statutory range for an offense is presumed to be proper. *People v. Thurmond*, 317 Ill. App. 3d 1133, 1142 (2000).

¶ 31　　　Walker objects to the following comments made by the court at his sentencing hearing:

"The imposition of the death penalty in this case is something that has to be taken into consideration as to the state of where we are in the State of Illinois with regard to the death penalty.

Is there really, is it a fiction, or is it really an option? It's an option in words but is it likely to be imposed if ordered? This is a case where as horrible, as disgusting as the thoughts are of what happened to Ms. Shorty are, this is a case where one person lost their life under horrendous circumstances, but it was one person, and we are in a state where individuals who have killed multiple people have not had the death penalty imposed on them.

We have a penalty that in the name of reform seems to have been hijacked in this state by people in positions of power. We have one disgraced governor sitting today in federal prison, who chose to empty death row of, I think it was about 167 individuals, without any regard for whether or not those individuals were guilty, innocent, or what the state of their evidence was. *** We have a current governor, who has continued a moritorium on imposing the death penalty while calling upon the early release of his predecessor just a couple of weeks ago. And now, we have the ridiculous state of affairs where this governor has now been arrested and he's in a position of making these kinds of decisions.

* * *

To sentence Mr. Walker to death would end up making him some sort of cult hero. It would put him in the position where in the future many well-meaning individuals who view the penalty as the crime rather than the crime as the crime, those individuals would be in a position of belittling everything that occurred here, belittling the extraordinary efforts of the legal counsel that has been representing Mr. Walker, attacking them and calling them ineffective, attacking the civilians, the police officers, civilians being the good, good neighbors, the kind of people that everybody would want living next door to them because they paid attention to certain things and they came forward when asked, they talked about it. They didn't try to lie or protect anybody, or protect themselves by not getting involved.

They would end up being challenged, attacked as liars, because they said it happened at one time and it was a different time, or they didn't go–they started their job at a hospital at 4:30 as opposed to 5:30 or vice versa. Those things would be just given status way beyond their level of importance in an effort to try to attack what has been an extraordinarily fair trial, and extraordinarily effective representation and very proper presentation of the evidence by the prosecution.

It's time. It's [*sic*] that Mr. Walker, that we are all done with Mr. Walker. That he's no longer someone who is having his case advanced by people who don't really care

what happened with Mrs. Brownlee [*sic*] as he has tried to attack a death sentence.

* * *

But Mr. Walker needs to be forgotten. He needs to have his appeal considered appropriately by the Appellate Court to see whether or not they view any errors contributed to his conviction such that if the case needs to be remanded, but then, and I don't think there will be. I think this was an extraordinarily fair process. *** So I'm sure I'll be in a position where I'll be hearing Mr. Walker's written petitions for a long time after I believe his sentence and conviction will be ultimately affirmed by the Appellate Court, but at least I won't have to look at Mr. Walker anymore while I'm resolving his post-conviction matters. *** But it's time for Mr. Walker to be sealed away from society."

¶ 32    We cannot view the sentencing judge's comments in isolation. The judge also discussed factors in mitigation, including the fact that Walker was born with fetal alcohol syndrome and suffered physical abuse at the hands of his mother. The judge also noted in aggravation that Walker "is given to extraordinarily violent outbursts of rage, and many people have suffered because of that rage, that uncontrolled anger," and Walker has refused "to do anything about it." The court believed that Walker should be "sealed away" to protect society. Relevant sentencing factors include a defendant's demeanor, habits, mentality, and moral character. *People v. Chapman*, 262 Ill. App. 3d 439, 462 (1992).

¶ 33    In *Thurmond*, the trial judge expressed his hostility toward legislation allowing probation as a sentence for criminal sexual assault. The trial judge stated:

" 'The legislators seem to think[,] and I'm not sure I understand the logic behind this[,] but they seem to think that a person who sexually abuses someone in his own family can get probation whereas someone who sexually abuses a stranger cannot. *** [It s]eems to me that [sexually abusing] someone in your own family is more aggravating than [sexually abusing] someone you just happen to grab off the street. *** But it's the legislature's prerogative. The court will consider [probation].' " *Thurmond*, 317 Ill. App. 3d at 1141.

This court determined that the remarks, while ill-advised, did not justify reversal because personal comments or observations "are generally of no consequence where the record shows the court otherwise considered proper sentencing factors." *Thurmond*, 317 Ill. App. 3d at 1142. We also found significant the fact that the trial court stated it would follow the law and consider probation, despite its displeasure with the legislation. *Id.* Furthermore, the sentence carried a presumption of propriety because it was within the statutory range for the offense. *Id.*

¶ 34    Like *Thurmond*, the trial judge here considered proper factors when he sentenced Walker. Therefore, his comments indicating his personal beliefs about politics and the criminal justice system, although ill-advised, do not justify remandment for resentencing. Also, Walker acknowledges that his sentence of natural life imprisonment falls within the statutory range for his offense. *People v. Lang*, 366 Ill. App. 3d 588 (2006), cited by Walker as support, is inapposite. In *Lang*, the trial judge failed to weigh the evidence presented at the sentencing hearing and instead sentenced defendants only "for punishment." *Id.* at 592.

Unlike *Lang*, the trial judge here did weigh the mitigating and aggravating factors, and he did not state that he was sentencing Walker for punishment only. No error occurred here.

¶ 35    Walker also argues that the following comment shows the trial judge harbored "a particular vitriol" toward him, and the judge improperly allowed his personal feelings to affect sentencing:

> "You asked, Mr. Walker, at one time to the detectives, what do you think I am, when they suggested that perhaps you had attacked Mrs. Shorty in a way that you weren't admitting to. And Mr. Heilingoetter pointed out in his argument, everybody now knows what you are, Mr. Walker. You are a burglar, you are a home invader, you are a person that committed an aggravated criminal sexual assault on a dead or dying woman at least a dying woman. You attacked that woman and you sexually assaulted that woman and you left your semen in her body while she was probably bleeding to death based on all of the blood that's shown in the photographs in that bed. And ultimately she died.
>
> So that's what you are Mr. Walker. You're a murderer and everything else I said."

¶ 36    Walker contends that his case is like *People v. Henry*, 254 Ill. App. 3d 899, 905 (1993), in which the judge stated, " 'This is a disgusting crime. And that's why you are given this amount of time.' " *Henry* is distinguishable, however, in that the judge was quite clear in stating he based his sentence on the fact that he believed the defendant had committed a disgusting crime. As we discussed above, the trial judge here considered proper factors when he sentenced Walker. Also, the judge's comments merely reflect the evidence in the record. The jury convicted Walker of murder, criminal sexual assault and home invasion. His description of the crime is supported by the physical evidence. The trial judge did not commit reversible error. See also *Primm*, 319 Ill. App. 3d at 425-26 (the trial judge's statement that the defendant did " 'something that the Ku Klux Klan could never do. Kill more black folks tha[n] the Ku Klux Klan ever will. And you have the audacity to say I'm sorry. That's bull. You are a lunatic, a raving animal. That's what you are' " did not constitute reversible error because these personal observations "are of no consequence where the record shows the court otherwise considered proper sentencing factors").

¶ 37    Walker also argues that the trial judge engaged in improper speculation when he considered aggravating factors during sentencing. Specifically he objects to the following observation:

> "[Shorty's] daughter had to move out of state. Her daughter had to take Mr. Walker's son with her to protect that child and to prevent him from having any access to that child."

Walker contends that Shorty's daughter Brenda testified only that she left her mother's house in 1998 and moved to Ohio. No one actually testified that she left to protect her son from Walker. However, from the record it appears the trial judge made the remark in passing and did not refer to the subject again. The weight placed, if any, on this factor would have been insignificant and would not have resulted in a greater sentence.

¶ 38    Finally, we find that even if the trial judge's comments constituted error, such error did not prejudice Walker. The trial judge's consideration of an improper factor does not require remand for resentencing unless that factor contributed to a greater sentence. *Bourke*, 96 Ill.

2d at 332. At the sentencing hearing, the judge determined whether to impose the death penalty or a sentence of natural life imprisonment. He chose to sentence Walker to life in prison, the lesser of the sentences. Thus, even if the trial judge erred, Walker is not entitled to a new sentencing hearing because the error did not result in a greater sentence.

¶ 39    Walker also argues that he did not have a fair sentencing hearing because the trial judge misapprehended the applicable sentencing range. He contends that the judge's comments at the hearing indicate he assumed his only sentencing options were death or natural life imprisonment. Walker was eligible for the death penalty because the murder occurred during the course of two forcible felonies, and the applicable sentencing range is 20 years as the minimum and death as the maximum. See 730 ILCS 5/5-8-1(a)(1)(a), (b) (West 2000). Although the record reveals that the trial judge did choose between death and natural life in sentencing Walker, he was not operating under a misapprehension of the proper sentencing range. Rather, the transcript of the sentencing hearing shows that defense counsel asked for a sentence of natural life imprisonment. She stated, "Judge, we in no way, shape or form want to denigrate or diminish the loss of the life of Dorothy Shorty, and we do not believe that in asking for natural life that we are doing so." Walker cannot now "claim error in a trial court's ruling when [he] has acquiesced in that disposition." *Kosinski v. Inland Steel Co.*, 192 Ill. App. 3d 1017, 1026 (1989).

¶ 40    Walker next contends his statement should have been suppressed because evidence revealed he was mentally impaired, and the State did not meet its burden to prove that he knowingly and voluntarily made the statement. A confession is voluntary if "the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort." *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996). Factors to consider in making this determination include the defendant's age, education, intelligence, and mental capacity, whether he was apprised of his *Miranda* rights, whether he suffered any physical or mental abuse from police, and his previous experience with the criminal justice system. *People v. Morgan*, 197 Ill. 2d 404, 437 (2001). Evidence of defendant's mental deficiency alone does not render a statement involuntary. *In re W.C.*, 167 Ill. 2d 307, 328 (1995). A reviewing court gives great deference to the trial court's factual findings and will not reverse the trial court unless the findings are against the manifest weight of the evidence. *People v. Braggs*, 209 Ill. 2d 492, 505 (2004). However, the ultimate issue of whether the trial court properly ruled on a motion to suppress is reviewed *de novo*. *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 41    Walker was 28 years old at the time of his arrest. Dr. Gelbort administered a battery of tests and determined that Walker had a verbal IQ of 78 and a full-scale IQ of 80, and he read at a fifth-grade level. None of his scores, however, fell into the mental retardation range. Dr. Gelbort testified that Walker "in a very, very gross or superficial fashion" could understand words and have a very general understanding of sentences, but his ability to understand the overall concepts of *Miranda* warnings was "defective." However, Walker has had previous experiences with the criminal justice system and Dr. Gelbort acknowledged that he never asked him how many times he had heard *Miranda* warnings. Furthermore, in his statement Walker said he understood his rights and during interviews he was coherent and responsive. He stated that the police had treated him well. In his videotaped statement, Walker was again advised of his *Miranda* rights and stated that he was treated well while in custody. When

asked if Detective Turner or ASA Murphy had mistreated him, Walker said no. He never stated that anyone threatened him with a gun.

¶ 42 Although Walker's overall score of 80 on the IQ test is between the "mentally defective range" and "low-average range" of functioning, there is no indication he did not understand his *Miranda* rights. Also, his previous experience with the criminal justice system indicates a familiarity with his rights and negates his claim that his limited mental capacity rendered his statement involuntary. In fact, the record shows that Walker willingly and actively took part in his defense throughout the proceedings. See *People v. Gonzalez*, 351 Ill. App. 3d 192, 201-02 (2004) (although defendant had a full-scale IQ score of 67, the court found his statement was voluntary because there was no evidence that he did not understand his rights, and due to his prior experience with the criminal justice system, he displayed a familiarity with the interrogation process). The trial court also viewed Walker's videotaped statement twice and found that the statement was voluntarily, knowingly, and intelligently made. See *Slater*, 228 Ill. 2d at 160 (the supreme court found that defendant's statement was voluntary even though she had a full-scale IQ score of 74 because her limitations were not outwardly apparent to police and did not interfere with her ability to communicate with them; also, the court viewed the videotaped confession and found that defendant spoke fluently and was open and cooperative). We find that Walker's statement was voluntary and the trial court properly denied his motion to suppress.

¶ 43 Two cases Walker relies on in support, *Braggs* and *People v. Daniels*, 391 Ill. App. 3d 750 (2009), are distinguishable. In each case, the defendant clearly exhibited mental deficiencies due to extremely low IQ scores. See *Braggs*, 209 Ill. 2d at 501-03 (defendant was assessed as mentally retarded with an overall IQ of 54, she could not read or write, and only nodded but said nothing when given *Miranda* warnings); see also *Daniels*, 391 Ill. App. 3d at 783-84 (defendant initially scored 55 on the IQ test, was "functionally illiterate," and was "incapable of memorizing and recalling three items during a conversation"). In contrast, Walker scored an overall IQ of 80, read at a fifth-grade level, and was responsive and coherent during his interviews. *Braggs* and *Daniels* are inapposite.

¶ 44 Walker also disagrees that the State met its burden to show his statement was voluntary because it did not offer expert testimony to counter Dr. Gelbort's testimony that his overall ability to understand *Miranda* concepts was "defective." Although it is the State's burden to show by a preponderance of the evidence that a defendant's statement was voluntarily made, it need not rely on expert testimony to do so. *People v. Lamerson*, 190 Ill. App. 3d 52, 60 (1989). The trial court is not required to accept the opinions of psychiatrists, but instead must assess the credibility of, and ascertain the weight to be given to, such testimony. *Id.* The trial court may even reject a psychologist's opinion of a defendant's mental state and find, based on the testimony of police officers, that he understood his *Miranda* rights and voluntarily made the statement. *Id.* at 61. ASA Murphy testified that he introduced himself and read Walker his *Miranda* rights. Walker stated that he understood his rights and was coherent and responsive. The trial court observed the witnesses and the demeanor of Walker during the proceedings, and clearly found ASA Murphy credible. Its determination is not against the manifest weight of the evidence.

¶ 45 Walker further contends that no one testified at the second motion-to-suppress hearing

-12-

about his ability to understand his *Miranda* rights when he gave his initial statement to Detective Turner. Accordingly, he argues that his waiver of *Miranda* rights prior to giving his videotaped statement may not have been done knowingly but, instead, "may have been nothing more than acquiescence on [his] part, knowing that he had already inculpated himself." Walker cites *In re T.S.*, 151 Ill. App. 3d 344 (1986), as support. However, in *T.S.*, the juvenile defendant was interviewed without the presence of his parents and was not read his *Miranda* rights prior to the interview. There was also some evidence of coercion. The defendant gave an oral statement and immediately thereafter he was given *Miranda* warnings before he proceeded to give an identical written statement. *Id.* at 351. The court in *T.S.* found the written statement inadmissible, reasoning that "due to the coercion and improper tactics used in obtaining an unwarned oral statement, the administration of *Miranda* warnings immediately prior to the written statement did not cure the condition that rendered the oral statement inadmissible." *Id.* at 353. *T.S.* is distinguishable. In the case at bar, Walker was given his *Miranda* rights by Detective Turner before he gave his oral statement. Although Walker argues that he was coerced into giving the statement because Detective Turner held a gun to his head, there is no evidence other than his testimony to support his claim.

¶ 46    Walker also argues that his statement was not voluntary because his diminished mental capacity, combined with the stress from his altercation with police prior to his arrest, made him more susceptible to police coercion. Walker stated that the officers hit him, kneed him, "jumped on him" and put mace in his eyes. ASA Murphy testified, however, that he did not see any physical injuries on Walker. Additionally, Walker told him the police treated him well. In ruling on a motion to suppress, the trial court is in the best position to assess the credibility and demeanor of the witnesses, and it must resolve any conflicts in the evidence. *People v. Anderson*, 407 Ill. App. 3d 662, 667-68 (2011). The court also viewed Walker's videotaped confession twice. As discussed above, its determination that Walker knowingly and voluntarily gave his statement is not against the manifest weight of the evidence.

¶ 47    Walker next contends that the trial court erred in allowing the State to introduce evidence of other crimes, specifically the June 12, 2000, burglary and Walker's altercation with his mother and police at the station prior to his arrest. Although evidence of other crimes is not admissible to show a defendant's propensity to commit crimes, it is admissible if it is relevant for any other purpose. *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991). Such evidence is admissible to prove, among other things, *modus operandi*, motive, knowledge, intent, presence of criminal intent, consciousness of guilt, common design, and hostility toward the victim. *People v. Millighan*, 265 Ill. App. 3d 967, 972-73 (1994). Furthermore, where a defendant claims he was coerced into making a false confession, other crimes evidence is admissible to establish the accuracy of the confession. *People v. King*, 109 Ill. 2d 514, 531 (1986). When such evidence is offered, the trial court must weigh its probative value against its prejudicial effect. *People v. McKibbins*, 96 Ill. 2d 176, 187-88 (1983). The trial court has discretion in determining the admissibility of evidence at trial, and a reviewing court will not overturn the trial court's decision absent an abuse of that discretion. *Illgen*, 145 Ill. 2d at 364.

¶ 48    Walker argues that evidence of the June 12, 2000, burglary was not relevant for any purpose other than to show his propensity to commit crimes. Evidence is relevant if it tends

"to make the existence of any fact that is of consequence to the determination of an action more or less probable than it would be without the evidence." *Illgen*, 145 Ill. 2d at 365-66. The principal issue at trial was whether Walker committed the murder of Shorty, or whether the police coerced him into giving a false confession. In closing argument, defense counsel argued that the police orchestrated Walker's videotaped confession.

¶ 49    *People v. Tellez*, 235 Ill. App. 3d 542 (1992), is instructive. In *Tellez*, the defendant was charged with the murder of Archer Mueller. During the course of their investigation, the police recorded conversations the defendant had with his father-in-law and with an undercover FBI agent posing as a member of the Mafia. In the conversations, the defendant admitted he killed Mueller and he discussed future work as a "hit man" in organized crime. He also mentioned a "hit" he executed on Harold Rowley, the owner of Corby's restaurant in South Bend, Indiana, approximately three years earlier. *Id*. at 546-47. At trial, the defendant testified that he was engaged in a "private scheme" to solve Mueller's murder so he would be promoted. He stated that he lied about his involvement in the murders to gain the trust of the Mafia as part of his undercover investigation. He denied killing Rowley or Mueller. *Id*. at 552-53.

¶ 50    The trial court allowed the State to present evidence related to Rowley's murder. Five witnesses testified to the details of the defendant's involvement in the murder and to his connection to the weapon used in the crime. *Id*. at 550-52. On appeal, the defendant argued that the admission of this evidence deprived him of a fair trial. *Id.* at 554. This court found that the evidence was relevant because it corroborated the defendant's confession to Mueller's murder and refuted his claim that he lied about his involvement in both murders to further his undercover investigation. *Id.* at 555. Furthermore, the court did not find merit in the defendant's argument that error occurred because the State introduced excessive details of the Rowley murder through the testimony of numerous witnesses. It reasoned that even if "the State did prove too much, considering the overwhelming nature of the properly admitted evidence, we do not believe the admission of those details" prejudiced the defendant by affecting the verdict. *Id*. at 555-56.

¶ 51    Walker claimed his false statement resulted from coercion. However, Walker in his statement not only confessed to Shorty's murder but also volunteered information about a burglary he committed at her residence a week prior to her murder. He stated that he had burglarized Shorty's house on June 12, 2000, and cut his arm when he broke into her house. In fact, blood evidence was discovered under the window. He knew where she kept money in the house. He waited for her to leave for work before breaking in and taking $2,300 in cash. He later went to the hospital to treat his cut.

¶ 52    At trial, the State presented the testimony of two officers who investigated the burglary. Officer Turner stated that he noticed a broken window and some blood. Inside the house, the bedroom had been ransacked. Sergeant McNichols testified that he took a swab of the blood under the window for analysis. The State also called two witnesses to testify about the testing and results of the blood sample taken from the house. The blood was not sent for testing until weeks after Walker made his statement. When the results came back, they matched the blood standard taken from Walker. Dr. Constance Green testified that she treated Walker on June 12, 2000, for a cut on his arm caused by broken glass. Walker's sister testified that on June

13, 2000, she noticed that Walker was wearing new shoes and had a cut on his arm. Detective Turner testified that when he interviewed Walker, Walker told him that he had broken into Shorty's house a week earlier and taken $2,300. Walker made the same statement on videotape. Since Walker's statement included details of the burglary, this other crimes evidence was relevant to corroborate his statement and establish its accuracy. See *Tellez*, 235 Ill. App. 3d at 555; *King*, 109 Ill. 2d at 530-31.

¶ 53    Walker, however, argues that evidence of the burglary was not probative because it was not sufficiently similar to the charged offense of first degree murder. Walker also contends that *King* is inapposite because the other crimes evidence in *King* not only tended to corroborate the defendant's statement, but also established that the offender used the same weapon in both crimes. However, the requirement that the other crime bear "some threshold similarity" to the charged offense comes into play only if the other crime is used to show *modus operandi* or common design. *Illgen*, 145 Ill. 2d at 372. If the evidence is offered for some other purpose, "mere general areas of similarity will suffice." *Id.* at 373. The State presented the evidence to refute Walker's claim that he was coerced into giving a false confession, not to show *modus operandi* or common design. As discussed above, the trial court did not abuse its discretion when it allowed evidence of the burglary for this purpose.

¶ 54    Walker also contends that by allowing the State to present eight witnesses testifying to the burglary, the evidence became a focal point of the trial resulting in an improper "mini-trial" on the uncharged offense. Walker disputed the accuracy of his confession. To establish the accuracy of his confession, each State witness testified to facts supporting details of Walker's confession to the burglary. Furthermore, witnesses placed Walker at Shorty's residence around the time of the murder, and evidence showed that Shorty was sexually assaulted during the attack. Semen taken from her body matched Walker's DNA, and a bloodstain found on Walker's jeans matched Shorty's profile. It is reasonably debatable whether the testimony presented by the State was excessive. However, in light of "the overwhelming nature of the properly admitted evidence," admission of the testimony did not prejudice Walker. See *Tellez*, 235 Ill. App. 3d at 555-56.

¶ 55    In addition, out of 20 pages of transcript of the State's closing argument, only three paragraphs were devoted to the burglary evidence. In rebuttal, out of 20 pages of transcript the State's remarks about the burglary evidence encompassed approximately two pages and counsel made those remarks in response to defense counsel's closing argument. Its decision to limit references to the burglary evidence diminished the effect of any prejudice Walker may have suffered. See *People v. Johnson*, 406 Ill. App. 3d 805, 810 (2010).

¶ 56    The State also presented evidence of Walker's altercation at the police station. It argued that such evidence was relevant to show the circumstances of Walker's arrest and to clarify parts of Walker's statement regarding the altercation. Walker claimed that his confession was coerced. In his statement, Walker said that the officers came toward him, kneed him, and sprayed him with mace. He also described his face as swollen. The State presented testimony from Lieutenant Broderick that he was working as the watch commander at the police station on June 24, 2000, while two women were talking to two officers. He heard a bang and saw Walker coming through the front door. Walker shouted as he approached the women, and then he punched one of the women in the face. Broderick testified that he came toward

Walker to pat him down, but Walker began swinging his fists. Walker struck one of the other officers in the face and the officers attempted to subdue him. When he was under control, the officers took Walker to the lockup and later learned that Area 1 had issued a stop order on Walker. He was transported to Area 1, where he was questioned. This evidence properly refuted Walker's claim that his confession was coerced by showing the circumstances of Walker's arrest and his treatment by police at the station.

¶ 57    Walker argues that the evidence was prejudicial because in his statement he said that he followed his mother to the police station, and Lieutenant Broderick's testimony that Walker came into the station and punched a woman in the face implied that Walker hit his mother. Thus, the evidence impermissibly portrayed him as a person of questionable character and allowed the jury to convict him for reasons other than the offense for which he was on trial. However, Lieutenant Broderick never mentioned anything about Walker's mother being at the police station during his testimony and the State never referred to his mother during its closing arguments. Moreover, the State did not focus on it during the trial. In fact, the State did not even refer to the altercation in its closing argument or rebuttal and its decision "reduced the possible prejudicial effect of such evidence" at Walker's trial. *Johnson*, 406 Ill. App. 3d at 810.

¶ 58    The main cases Walker relies on in support are distinguishable. In *People v. Lenley*, 345 Ill. App. 3d 399 (2003), *People v. Bedoya*, 325 Ill. App. 3d 926 (2001), and *People v. Richee*, 355 Ill. App. 3d 43 (2005), the State did not offer other crimes evidence to corroborate and establish the accuracy of a confession. In *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995), the other crime involved "conduct far more grotesque than that for which [the defendant] was on trial." The court found that testimony repeating the "extremely inflammatory" details of the prior conduct which was "completely unrelated to the crime at issue" prejudiced the defendant, and its admission was an abuse of discretion. *Id.* In contrast, the burglary here did not involve "conduct far more grotesque" than the murder of Shorty. For the reasons stated, the trial court did not abuse its discretion in allowing the State to present the other crimes evidence.

¶ 59    Walker also contends that the trial court erred in denying his motion to quash his arrest and suppress evidence because police did not have probable cause to arrest him. This issue is waived on appeal. Walker in his brief merely concludes that at the time of his arrest, "the officers of the Chicago Police Department who arrested him did not have probable cause to effect such an arrest, and neither did the Department as a whole." He also states that "[i]t is elementary that probable cause can only be asserted on what the arresting officers knew at the time of arrest." That alone is not sufficient. He does not set forth the factors relevant in determining probable cause, or make an argument supported by citations to the record and to legal authority as to why probable cause did not exist. In his reply brief he does not address the issue further, but instead "rests on his argument raised in his opening brief." Accordingly, pursuant to Illinois Supreme Court Rule 341(h)(7), the issue is waived on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006).

¶ 60    Walker contends that the trial court erred in denying his original motion to suppress his statement. Walker testified that he gave his statement because Detective Turner threatened him with a gun. Detective Turner, however, denied that he had a gun when he interviewed

Walker although he acknowledged he had the ability to possess a gun. Walker merely concludes that his "credible testimony *** is enough to deem his subsequent statement involuntary and thus subject to suppression under the Fifth and Fourteenth Amendments of the United States Constitution." Walker provides no citation to authority for this conclusion, nor does he expand on this argument. His reply brief does not address the issue any further. This issue is also waived pursuant to Rule 341(h)(7).

¶ 61    Walker argues that the trial court erroneously admitted the testimony of forensic professional Debora Depcynski, who testified in lieu of technician Peter Bosco. Bosco received and tested swabs containing blood found under the window in the burglary case. He was deceased at the time of trial, and Depcynski reviewed his file in preparation for trial. Walker challenged her testimony on the basis of hearsay because she did not review the file during the course of her supervisory activities, and on the basis that she was not qualified to testify regarding the chain of custody of the evidence. Again, Walker cites little or no authority on this issue, thereby waiving its review on appeal. Furthermore, even if the trial court erred in admitting the evidence, the error was harmless. The testimony related to evidence in the burglary, not to evidence in the murder. As discussed above, the evidence related to Shorty's murder is overwhelming. "[T]he improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission." *People v. Nieves*, 193 Ill. 2d 513, 530 (2000).

¶ 62    Walker also challenges the trial court's grant of the State's motion *in limine* to bar evidence of a prior theft involving its expert witness, Amy Rehnstrom. He argues that he should have been allowed to use the evidence to impeach Rehnstrom. At issue was Rehnstrom's indictment in 2004 for deceptive practices and theft while she worked as an Illinois state lab technician. She pled guilty to the charge, was terminated, and served a period of supervision which she successfully completed. The record shows that at the hearing on the motion *in limine*, the trial court found that Rehnstrom had conducted and completed testing on the evidence in Walker's case in 2000 and 2002, two to four years prior to her misconduct. It granted the State's motion, determining that the theft was "too remote, too far removed," to contribute to her bias, interest, or motive in testifying. See *People v. Bull*, 185 Ill. 2d 179, 206 (1998). Walker provides little argument and no citation to authority to counter the trial court's ruling. The trial court did not err in granting the motion *in limine*.

¶ 63    Walker further argues that the trial court should have barred Rehnstrom's testimony because the State did not comply with section 115-22 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-22 (West 2010)), which requires the State to disclose to defendant and his counsel whether a witness has received inducements such as pay, immunity from prosecution, or leniency in exchange for testimony. He contends that the failure to disclose this information limited his ability to exercise his constitutional right to confront a witness. Again, Walker does not provide any citations to authority in support of his argument. Furthermore, the record reveals that at the hearing the State informed the trial court that it had great difficulty getting Rehnstrom, who now lives out of state, to testify at Walker's trial. The State paid her expenses and disclosed those costs to the court and defense counsel on the day she testified. The trial court asked Rehnstrom under oath whether she made any deals with the State in exchange for her testimony and she answered, "No." During her direct

examination, the State revealed that it had paid her expenses of $695 up to the day of her testimony, and Rehnstrom agreed that the State did not promise her anything for her testimony. Defense counsel then had the opportunity to cross-examine Rehnstrom. The trial court did not err in refusing to bar Rehnstrom's testimony.

¶ 64 Since we find no reversible error on any issue, there is no cumulative error warranting a new trial.

¶ 65 Walker's final contention is that this court should correct his mittimus to reflect only one conviction for first degree murder and one conviction for aggravated criminal sexual assault, as well as the conviction for home invasion. See *People v. King*, 66 Ill. 2d 551 (1977) (multiple convictions are improper if based on the same act). The State agrees with Walker that two of his murder convictions and one of his aggravated criminal sexual assault convictions should be vacated. We likewise agree and therefore order that the mittimus be corrected accordingly.

¶ 66 For the foregoing reasons, we affirm Walker's conviction and sentence and direct the clerk of the circuit court to correct the mittimus.

¶ 67 Affirmed; mittimus corrected.