# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Tomei*, 2013 IL App (1st) 112632

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KURT TOMEI, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-2632 |
| Filed | February 15, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for criminal trespass to real property and criminal damage to property were upheld based on the testimony of a witness who viewed a live surveillance video of the offenses as they occurred, since the witness's degree of attention was sufficient to support a positive identification of defendant, the discrepancies in his testimony did not undermine the reliability of the identification, defendant's challenge of the certainty of the identification was not persuasive in the absence of expert testimony, and only 15 minutes elapsed between the time the witness saw the surveillance feed and the identification. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-MC-4011789; the Hon. Gregory Robert Ginex, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Shawn O'Toole, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.

Presiding Justice Lampkin and Justice Reyes concurred in the judgment.


**OPINION**

¶ 1     Following a bench trial, defendant Kurt Tomei was convicted of criminal trespass to real property and criminal damage to property. After hearing factors in aggravation and mitigation, defendant was sentenced to 30 days in the Cook County department of corrections with a 6-day credit for time considered served, 2 years' conditional discharge, plus statutory fines and fees. On this appeal, defendant argues the sufficiency of the evidence, claiming that the State failed to prove him guilty beyond a reasonable doubt because the sole eyewitness's identification of defendant as the offender was not reliable enough to support a conviction. For the following reasons, we affirm.


¶ 2                                         BACKGROUND

¶ 3     The trial court found defendant guilty of criminal trespass to real property and criminal damage to property. Both offenses resulted from a break-in at approximately 12:30 a.m. on December 19, 2009, at a Franklin Park business owned by Frank Calistro, the sole witness to the trespass and damage to the property. Nothing was claimed taken by Calistro. The State's evidence established that Franklin Park police pulled over defendant in a motor vehicle a few blocks from the business and Calistro identified him there as one of the two men he had observed on his property over a live surveillance video feed, similar to a closed-circuit television broadcast, in which Calistro was able to observe the crime as it was happening. The video feed was broadcast online and Calistro accessed it on his laptop computer, but the video system did not record what he observed. After Calistro identified defendant in a showup[1] identification at the scene, defendant was stopped in his motor vehicle, the police arrested defendant and then found an open bag of tools, which included bolt cutters, in the backseat of defendant's automobile.

---

[1] A "showup" is a procedure where a witness identifies a suspect on site, as opposed to picking the suspect out of a lineup or a photo array.

¶ 4                                    I. Suppression Hearing

¶ 5        Prior to trial, defendant filed a motion to quash his arrest and suppress evidence, arguing that the traffic stop and arrest lacked probable cause. At the suppression hearing the trial court heard testimony from two witnesses: Franklin Park police officer Yracheta,[2] who responded to the burglary, and Officer Steven Ross, who pulled over defendant in his motor vehicle five blocks from the scene of the crime.

¶ 6                                A. Officer Yracheta's Testimony

¶ 7        Officer Yracheta testified that at 1 a.m. on December 19, 2009, he received a radio dispatch concerning a burglary in progress at a nearby business on Fullerton Avenue in Franklin Park. Yracheta was three blocks from the business when he received the call and it took him less than a minute to drive to the scene. On his way over, a radio dispatcher described the suspects as "two male whites, dark jacket and dark hats." Upon his arrival, Yracheta waited for a few minutes for the owner of the property, Frank Calistro, to arrive. The property was "basically a storage yard" surrounded by a fence with a number of trailers, trucks, and other construction equipment inside. Yracheta observed surveillance cameras on the property positioned between 6 and 10 feet above ground.

¶ 8        Once Calistro arrived at the scene, Calistro told Yracheta that motion sensors had gone off and that he had accessed a live video feed on his computer, observing "two male whites in black clothing, black hats" looking through trucks and trailers stored on the property. At the time, Calistro indicated that "he could pretty much clearly see who they were." Calistro told Yracheta that he had difficulty recording the video feed and Yracheta did not observe the video feed nor did Calistro show the officer his laptop.

¶ 9        Yracheta observed a white four-door vehicle driving down an alleyway that leads to the property while talking to Calistro. The vehicle was 30 feet away, with two white males, both "wearing black jackets and black hats." As the vehicle turned east onto Fullerton Avenue and passed within 10 feet of Yracheta, he used his flashlight and observed defendant driving. He then radioed in a description of the vehicle, including its license plate number, and asked for any available officers to pull the vehicle over. There were overhead streetlights on Fullerton Avenue and Yracheta observed no other vehicles on the street at that time.

¶ 10       When Yracheta went to search the property with Calistro, he observed a hole cut into a chain-link fence, as well as a broken utility box and damaged trailers. After a few minutes searching the property, Yracheta received a call that the white vehicle had been pulled over nearby. Both he and Calistro then drove to that scene in separate vehicles. When Yracheta arrived, he observed the two white male suspects standing in front of the white vehicle, with at least four other officers at the location. The defendant was one of the suspects and Calistro identified him in court, but Yracheta did not observe Calistro identify defendant at the location of the stop.

---

[2]Officer Yracheta's first name does not appear in the appellate record.

¶ 11                                    B. Officer Steven Ross's Testimony

¶ 12        Officer Steven Ross testified that on December 16, 2009, he was alone on patrol when he received a dispatch about a burglary at a nearby business. As he was driving to the business, he received another dispatch from Yracheta that the burglary suspects were in a white four-door sedan driving east on Fullerton Avenue. Seconds after receiving the call, Ross observed a white vehicle crossing the intersection of Oak Street heading east on Fullerton. He did not observe the vehicle breaking any traffic laws. The description of the vehicle and its license plates matched the description provided by Yracheta, so he then pulled the vehicle over and observed two white males, both wearing dark jackets and dark hats. He asked for and received identification from defendant, who was the driver, and identified defendant in court. Officer Ross asked both men why they were observed leaving the alley near Calistro's business and neither responded to his question.

¶ 13        Another Franklin Park policeman, Officer Glover,[3] had arrived at the scene of the stop and asked the suspects to exit the vehicle. Ross then received defendant's consent to search the vehicle and observed a black bag and box on the backseat. The bag was open and bolt cutters were found inside. In addition, the bag contained screwdrivers, hammers, and other tools. Defendant told the officers that he was a painter. The two suspects stood in front of the vehicle and were not handcuffed during the search, and the officers did not draw their weapons or touch either of the suspects. After the search, two more officers arrived, as well as Frank Calistro, who identified the suspects as the men he had observed through the video feed. Calistro stood several feet away from the suspects when he made the identifications and there were streetlights overhead, and the street was generally well lit. After Calistro's identification, the suspects were placed under arrest.

¶ 14        Defendant asked the trial court to quash the arrest on the ground that the police lacked the reasonable suspicion needed to support the initial *Terry* stop of defendant. After hearing the evidence and arguments, the trial court found that the officers had a reasonable, articulable suspicion to believe that the suspects were the same two men that Calistro had observed on the video feed, trespassing on his property. The trial court denied defendant's motion to quash the arrest and the evidence, finding that the initial stop was proper.


¶ 15                                              II. Trial

¶ 16        At trial, the State called three witnesses: Stanley Stann, the owner of the property where the crime took place; Frank Calistro, the owner of the business that was broken into and the sole witness to the trespass and damage to property, and Franklin Park police officer Steven Ross, who pulled over defendant's vehicle near the scene of the crime.


¶ 17                                       A. Stanley Stann's Testimony

¶ 18        Stanley Stann testified that he owns the property that was broken into, which is located on Fullerton Avenue in Franklin Park. He testified that he had leased the property to Calistro

_____

[3]Officer Glover's first name does not appear in the appellate record.

on a month-to-month lease for eight years, and that Calistro owns and operates a business on the property. The property is surrounded by a barbed wire fence and there are "no trespassing" signs posted throughout. Stann did not know who defendant was and he had never given him permission to be on the property.

¶ 19                           B. Frank Calistro's Testimony

¶ 20     Frank Calistro testified that he owns and operates a brick-laying business located on the property owned by Stann, and he lives in River Grove, less than half a mile away from his business. In either June or July of 2009, he installed a security system on the property by himself. The system includes several motion sensors that trigger a silent alarm if movement is detected on the property. When the motion sensors are tripped, the security system alerts him by sending a message to his cellular telephone. The security system also includes three video cameras, which are viewable online. Calistro described the camera as follows:

> "It's a Panasonic. The word for it would be nonbreakable industrial strength camera so that they can't hit it with a baseball bat and break it. And it's a higher end camera. It's about 580 lines of resolution camera in color."[4]

Calistro had installed six spotlights on the property, one of which was always on and at least two of which were activated by the motion sensors to illuminate the cameras' field of vision.

¶ 21     Calistro testified that at 12:30 a.m. on December 16, 2009, he had just arrived home and had undressed. At that time, he received an automated message on his cellular telephone that a motion sensor had been tripped at his business. He then logged onto his laptop to view a live video feed from the surveillance cameras on the property, and he observed two people "wearing dark clothing" and "heavy jackets" standing beneath the motion-activated spotlights and facing the camera from about 10 to 15 feet away. The video camera through which he observed the suspects was mounted on a trailer about eight feet above the ground, and the camera was clear enough to observe the suspects' faces. Defendant was one of the two men he observed on the video and Calistro identified defendant in court and earlier when the police stopped the motor vehicle in which they were traveling. In the video, Calistro observed the shorter of the two men, whom he identified as defendant, holding bolt cutters. The two men were looking through trucks and trailers but Calistro did not observe defendant actually use the bolt cutters or damage the property. One of the two men was wearing a hat but Calistro was not sure which one. He did not remember what color or type of jackets the suspects were wearing. Calistro did not know who the suspects were prior to that day and he had not given them permission to be on the property.

¶ 22     Calistro then called the police to report the break-in and told the dispatcher that he observed "two white males" wearing "a dark cap" and "heavy jackets," and that there might have been a third person with them. As he was on the telephone, Calistro was dressing and viewing the video feed on his laptop. He then left his house and drove to the scene of the

---

[4]"Lines of resolution" refers to the vertical pixilation of a video image. Standard television is broadcast in 480 pixels, while high definition is typically viewed in either 720 or 1,080 pixels.

break-in.

¶ 23 It took Calistro a minute to drive there and Officer Yracheta was already at the scene. As Calistro was pulling up, he observed a white Crown Victoria vehicle exit an alley that runs along the property. The vehicle crossed in front of him and drove east down Fullerton Avenue. Calistro exited his vehicle and met with Yracheta. Calistro had forgotten his keys in his rush to drive to the property, and he and Yracheta had to climb over a barbed wire fence to enter the yard. After scaling the fence, they then searched the yard for about five minutes to determine if the suspects were still there. Calistro did not find anyone on the property, but he did observe that the lock on a utility trailer was broken and that several other trailers appeared to have been broken into; that a hole had been cut into a fence, allowing access to one of the trailers; and that a utility box had been broken. However, he did not notice that anything was missing.

¶ 24 While they were in the yard, Yracheta told him that the white vehicle had been stopped approximately one block away. He left the yard and was then driven by another officer to the location of the stop. After he arrived, he observed two men standing in front of the same white vehicle that he had observed leaving the alley along the property. Calistro then identified the suspects as the same "two guys on the camera." The two men were wearing the same clothes as they had been when he observed them on the video, and he recognized their faces. Calistro had "no doubt" that defendant was the same person he observed on the video.

¶ 25 The video feed on Calistro's laptop was designed to record but it did not. Apparently a person on the property had turned the video recorder off. Sometime after the night of the break-in, he invited the police into his home to show them his security system but he did not show them his laptop or the video cameras.

¶ 26 C. Officer Steven Ross's Testimony

¶ 27 At trial, Officer Steven Ross testified that he responded to a dispatch of an ongoing burglary at 1 a.m. on December 16, 2009. Before he could arrive at the site of the break-in, he received a dispatch from Officer Yracheta that a white Ford Crown Victoria was leaving the scene of the crime and heading east on Fullerton Avenue. Yracheta described the suspects as "two male whites, [wearing] dark jackets and dark hats." Officer Ross then observed a white vehicle drive past him less than a block away.

¶ 28 Ross pulled over the white vehicle and asked the driver for identification. There were two men in the vehicle, both wearing "dark clothing, dark jackets, and dark hats." Officer Ross asked the men why they were leaving the area but neither responded, and he used his flashlight to look into the vehicle and observed a black bag and box on the backseat. The bag was open and Ross could observe bolt cutters, screwdrivers, and other tools. Defendant then gave responding Officer Glover permission to search the vehicle and Ross found paint spraying equipment in the box also. When Ross asked defendant about the contents of the box, defendant told him that he was a professional painter.

¶ 29 Ross testified that Frank Calistro then arrived and identified the two men as the same two men that he had observed on the video feed. Ross heard Calistro say: "Those are the guys that were in my yard." In his report, Ross memorialized that Calistro identified the passenger

but did not indicate whether Calistro had identified defendant.

¶ 30    At the conclusion of the case, the trial court found defendant guilty of criminal trespass to real property and criminal damage to property. The trial court determined that the fact that the security video was a live feed that was not recorded went only to the weight of Calistro's testimony and not to its admissibility. The trial court also determined that it was not necessary to show that defendant had personally used the bolt cutters. The trial court concluded that, "the circumstantial evidence here is extremely more than any coincidence and well beyond a reasonable doubt."

¶ 31                                ANALYSIS

¶ 32    On this appeal, defendant contests the sufficiency of the evidence and argues that the State failed to prove him guilty beyond a reasonable doubt because the sole eyewitness's identification of defendant was not reliable enough to support a conviction. For the following reasons, we affirm defendant's conviction.

¶ 33                          I. Standard of Review

¶ 34    When reviewing a claim of insufficient evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We will not reverse a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to witnesses' testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 35                        II. Witness Identification

¶ 36    Defendant claims that Frank Calistro's identification was insufficient to prove defendant guilty beyond a reasonable doubt. Although the State "has the burden of proving beyond reasonable doubt the identity of the person who committed the crime" (*People v. Slim*, 127 Ill. 2d 302, 307 (1989)), "identification of the accused by a single eyewitness is sufficient to sustain a conviction" (*People v. Johnson*, 114 Ill. 2d 170, 189 (1986)).

¶ 37    Defendant lists the five factors used by Illinois courts to evaluate the reliability of an identification: (1) the witness's opportunity to view the suspect during the offense; (2) the witness's degree of attention; (3) the accuracy of any prior descriptions provided; (4) the witness's level of certainty at the time of the identification procedure; and (5) the length of time between the crime and the identification. *Slim*, 127 Ill. 2d at 307-08 (citing *Neil v. Biggers*, 409 U.S. 188, 199 (1980)). These five factors are referred to as the *Biggers* factors. *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007).

¶ 38                                    A. Opportunity to View

¶ 39     With respect to the first *Biggers* factor, the State claims that the fact that Frank Calistro observed the crime through a video feed does not damage the reliability of his opportunity to view the suspect during the offense. Defendant argues that Calistro's opportunity to view the suspects was unreliable because the State did not offer evidence of the size, clarity, resolution, or zoom of the video on his laptop. Defendant claims that the trial court erred in weighing Calistro's opportunity to view because it did not consider the less-than-ideal viewing conditions.

¶ 40     When considering whether a witness had an opportunity to view the offender at the time of the offense, courts look at "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." *People v. Carlton*, 78 Ill. App. 3d 1098, 1105 (1979). In the instant case, Calistro testified that he had a sufficient opportunity to view the suspects when he observed them over a live video feed. The camera was positioned about eight feet high, and there were spotlights that brightened its field of vision. Calistro testified that the video feed was clear enough that he recognized defendant's face. He later identified defendant as the man he observed on the video feed at the time defendant was stopped by the police.

¶ 41     A witness may testify to what he or she observed on a video feed as long as he or she observed the incident at the time it occurred. *People v. Tharpe-Williams*, 286 Ill. App. 3d 605, 610-11 (1997). A witness's testimony about what he or she observed on a live video feed is no different than if he or she "had been 100 yards away from defendant at the time of the incident but [he or she] needed a telescope to observe what was happening. As long as the telescope was functioning properly, we see no reason why [he or she] would not be able to testify as to what [he or she] observed." *Tharpe-Williams*, 286 Ill. App. 3d at 611.

¶ 42     Defendant claims that Calistro's testimony requires foundational proof that the video camera was "functioning properly." *Tharpe-Williams*, 286 Ill. App. 3d at 609. However, evidentiary flaws in foundation can affect only the weight of the testimony. *Village Discount Outlet v. Illinois Department of Employment Security*, 384 Ill. App. 3d 522, 525-26 (2008). Defendant claims that the camera system malfunctioned because it did not record the video as it was designed to do. However, Calistro did not testify that the camera system was broken. Instead, he testified that the record function on his laptop was turned off. There is no other evidence in the case at bar to suggest that the camera system was malfunctioning. Viewing the facts in the light most favorable to the prosecution, we conclude there was sufficient evidence for a rational trier of fact to conclude that the security camera system was working properly.

¶ 43     Defendant argues that the foundation for the video evidence must be judged against the factors set forth in *People v. Taylor*, 2011 IL 110067, ¶ 33. In *Taylor*, the court found that the following factors were relevant to determine the adequacy of a video tape offered into evidence: (1) the device's capability for recording and its general reliability; (2) the competency of the operator; (3) the proper operation of the device; (4) the manner in which the recording was preserved (chain of custody); (5) the identification of the persons, locale, or objects depicted; and (6) an explanation of any copying or duplication. *Taylor*, 2011 IL

110067, ¶ 33. The appellate court held that these factors are used to establish the "accuracy of *** surveillance camera recordings." *Taylor*, 2011 IL 110067, ¶ 33. Defendant argues that because Calistro's opportunity to view defendant during his commission of the offense depends on the accuracy of his video equipment, the *Taylor* factors provide a framework to evaluate whether he could sufficiently view the suspects on the property.

¶ 44    However, the *Taylor* factors are not applicable to the instant case because the appellate court in *Taylor* used the factors to determine the admissibility of a videotape used under the "silent witness" theory. *Taylor*, 2011 IL 110067, ¶ 22. "[U]nder the 'silent witness' theory, photographic or videotape evidence may be admitted without an eyewitness to establish the accuracy of the images depicted if there is sufficient proof of the reliability of the process that produced the photograph or videotape." *Taylor*, 2011 IL 110067, ¶ 22. In *Taylor*, there was no eyewitness testimony and the court used the factors to consider the admissibility of the videotape without a witness to authenticate it. In the instant case, the State did not offer a videotape into evidence at all but instead heard Calistro's eyewitness testimony about what he observed on a live video feed.

¶ 45    Illinois courts have found that a witness's testimony regarding what that witness observed on a live video feed requires only foundational proof that the video system was functioning properly at the time that the images were depicted by the witness. *Tharpe-Williams*, 286 Ill. App. 3d at 610-11. This foundational consideration is a lower standard than the one used when admitting videotape under the "silent witness" theory. As we have previously indicated, there was no evidence that the camera was malfunctioning. Calistro testified that the camera recorded in 580 pixel color resolution and was mounted eight feet above the ground and aimed directly at defendant, who was illuminated by a spotlight. The trial court found that Calistro's testimony was "credible as to his identification" based on the "description of the video equipment and the images portrayed and how thorough and precise the image was captured." Based on this testimony, a rational trier of fact could find that the witness had a sufficient opportunity to view defendant during the commission of the crime.

¶ 46                                B. Degree of Attention

¶ 47    With respect to the second *Biggers* factor, the State claims that Calistro paid close attention to what he observed on the video feed. By contrast, defendant claims that Calistro was distracted while watching the video on his laptop screen because he was simultaneously talking to the police dispatcher on his telephone and putting on his clothes. Despite rushing out the door, Calistro testified that he had viewed the feed for a few minutes and that he had recognized defendant's face when he identified him at the showup at the scene of the stop. Issues of witness reliability are for the finder of fact to determine (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009)), and the trial court found Calistro's identification to be credible. A rational trier of fact could have found Calistro's degree of attention was sufficient as to make a positive identification of defendant, and we will not substitute our judgment for that of the trial court. *Jackson*, 232 Ill. 2d at 281.

¶ 48                                    C. Accuracy of Prior Description

¶ 49        With respect to the third *Biggers* factor, the State claims that Calistro provided an accurate description to the police, while defendant claims that the description was inaccurate because Calistro was inconsistent in identifying the suspects' hats. Defendant further argues that Calistro's description was generic and vague because Calistro focused mainly on the suspects' race and clothing.

¶ 50        Calistro told the police that he observed two white males wearing dark jackets and dark hats on the video feed. Defendant and his passenger are both white males and were observed wearing dark hats and jackets that evening. Defendant points out that Calistro testified that he told police that there may have been a third suspect involved and that only one of the suspects was wearing a hat.[5] Officer Ross testified that there were only two men in the vehicle he stopped and that both were wearing hats. However, "[t]he presence of discrepancies or omissions in a witness' description of the accused do not in and of themselves generate a reasonable doubt as long as a positive identification has been made." *People v. Magee,* 374 Ill. App. 3d 1024, 1032 (2007) (citing *People v. Slim*, 127 Ill. 2d 302, 309 (1989)). While there may have been minor discrepancies in Calistro's testimony, his general description of defendant as one of the offenders was accurate. The trial court, as the trier of fact, had the opportunity to determine the credibility of the witnesses and the weight to be given to their testimony (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009)), and it found that Calistro was credible as to his identification. We cannot say, when viewed in the light most favorable to the State, that these discrepancies fatally undermine the reliability of Calistro's identification.

¶ 51        Defendant also claims that the accuracy of Calistro's identification is undermined by the fact that he described the suspects only by their race and clothing. Defendant cites *People v. Hughes*, 59 Ill. App. 3d 860, 863 (1978), *People v. Moore*, 6 Ill. App. 3d 932, 936 (1972), and *People v. Kincy*, 72 Ill. App. 2d 419, 427-28 (1966), as instances where Illinois courts have reversed convictions based on a witness's identification of clothing alone. Defendant argues that Calistro's generic description weighs against the reliability of his identification because virtually any white male in the area at the time would have fit the description of wearing a heavy coat and hat.

¶ 52        However, our supreme court has held that "a witness is not expected or required to distinguish individual and separate features of a suspect in making an identification. Instead, a witness' positive identification can be sufficient even though the witness gives only a general description based on the total impression the accused's appearance made." *People v. Slim*, 127 Ill. 2d 302, 308-09 (1989). Unlike the cases cited by defendant, Calistro made a positive identification of defendant. He testified that he recognized defendant's face. The trial court found him to be credible in his identification, and we will not substitute our judgment for the trial court. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

_____

[5]Calistro also testified that the suspects, in the plural, were wearing caps.

¶ 53                              D. Level of Certainty

¶ 54        With respect to the fourth *Biggers* factor, the State claims that Calistro never wavered in his degree of certainty when he identified defendant as one of the men he observed on the video feed. Defendant does not dispute the amount of certainty Calistro expressed, and instead argues that this factor should be given little weight because there is a low correlation between a witness's confidence and the accuracy of his or her identification. *People v. Allen*, 376 Ill. App. 3d 511, 524 (2007). Defendant argues that courts have found that a "witness's faith is equally strong whether or not the identification is correct" (*Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2003)), and that "mistaken eyewitness identifications are responsible for more wrongful convictions than all other causes combined" (internal quotation marks omitted) (*United States v. Brownlee*, 454 F.3d 131, 143-44 (3d Cir. 2006)). Defendant also cites a study by Professor Brandon Garrett of Harvard University, who examined cases of mistaken identity and found that "almost all of the eyewitness *** expressed complete confidence at trial that they had identified the attacker." Brandon L. Garrett, Convincing the Innocent: Where Criminal Prosecutions Go Wrong 62 (2011).

¶ 55        However, the cases defendant cites are distinguishable from the instant case. In *Allen*, we found that the trial court committed reversible error when it refused to allow an expert to testify to an individual's ability to identify another individual pursuant to a study. *Allen*, 376 Ill. App. 3d at 513. Here, defendant did not offer an expert to testify about eyewitness identification research. Illinois courts have previously found that "a trial court may omit one of the *Biggers* factors *** based on the 'evidence,' and the 'evidence' may include the kind of social science evidence proposed in *Allen*. [Citation.] For example, if the defendant in the case at bar had introduced into evidence the testimony of an expert in eyewitness identification research, the trial court may have [then] chosen, based on the evidence presented in the case, to omit one of the listed factors." *People v. Rodriguez*, 387 Ill. App. 3d 812, 824 (2008). However, in the instant case, no such evidence was offered at trial.

¶ 56        *Newsome* and *Brownlee* are also distinguishable because both of those cases found that the trial court had improperly excluded witness testimony regarding the ability of individuals to identify other individuals pursuant to identical studies. Since defendant did not present expert testimony, we do not find defendant's argument persuasive that the fourth factor, the witness's level of certainty, should be given little weight.


¶ 57                           E. Length of Time Elapsed

¶ 58        With respect to the fifth *Biggers* factor, the State claims that the lapse of time between the crime and the showup identification was brief and did not influence Calistro's reliability. The State argues that defendant's appearance was still fresh in Calistro's mind because only 15 minutes elapsed between the time he observed defendant on the video feed and his subsequent identification. Defendant does not dispute the length of time that elapsed or whether it was damaging to Calistro's identification. Instead, defendant argues that the identification itself is heavily damaged by the fact that it was made during a highly suggestive and unreliable showup procedure. Defendant, however, does not allege the showup to be so suggestive as to be inadmissible under the due process clause, but rather that

the showup was not sufficiently reliable to prove defendant guilty beyond a reasonable doubt.

¶ 59 "Normally, the [trier of fact] decides the weight that an identification deserves; and the less reliable the [trier of fact] finds the identification to be, the less weight the [trier of fact] will give it." *Rodriguez*, 387 Ill. App. 3d at 829 (citing *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003)). Here, the trial court was the trier of fact and had the opportunity to determine the credibility of the witnesses and the weight to be given to their testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2008). Defendant did not call an expert to testify to the prejudicial nature of the showup procedure, nor did he present any evidence that the procedure was suggestive or unreliable. The trial court weighed the evidence and found that Calistro's identification was reliable. We cannot say, when viewed in the light most favorable to the State, that the showup procedure undermined the reliability of the witness's identification. In sum, we will not substitute our judgment for that of the trial court in regard to the reliability or weight of the witness's identification.

¶ 60                                        CONCLUSION

¶ 61 For the foregoing reasons, after viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of criminal trespass to real property and criminal damage to property beyond a reasonable doubt, and we affirm defendant's conviction.

¶ 62 Affirmed.