2023 IL App (1st) 191381-U

No. 1-19-1381
THIRD DIVISION
June 30, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 17 CR 12511 |
| | ) | |
| CESAR MALDONADO, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Burke and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: The judgment of the circuit court of Cook County is affirmed where the court did not incorrectly recall any material evidence which was crucial to the defense and where the court's comments on gang membership did not deprive the defendant of a fair sentencing hearing.

¶ 2    Defendant Cesar Maldonado was charged with shooting at four occupants of a minivan, two of whom were injured. Following a bench trial, defendant was convicted of two counts of aggravated battery and sentenced to an aggregate term of 25 years' imprisonment. On appeal, defendant contends that he was denied due process and a fair trial where the trial court inaccurately recalled certain defense evidence. Defendant further argues that he was denied a fair sentencing hearing where the trial court considered improper factors, *i.e.*, the court stressed

that the shooting was gang-motivated and offered personal commentary on gang membership. For the reasons discussed herein, we affirm.

¶ 3                                  BACKGROUND

¶ 4     Pursuant to a 14-count indictment, defendant was charged with the attempted first-degree murder and aggravated battery of both Jorge Villa (Villa) and Miguel Sorto (Sorto).  Defendant was also charged with aggravated discharge of a firearm as to Enrique Uribe (Uribe) and Miguel Landin (Landin).  The testimony and other evidence adduced at trial included the following.

¶ 5                                  *Jorge Villa*

¶ 6     Villa testified that on the afternoon of January 25, 2016, he was "working on music" with three friends – Sorto, Uribe, and Landin – at his mother's residence in Chicago.  Sorto left to visit his girlfriend.  Uribe subsequently received two phone calls from Sorto, who was walking back from his girlfriend's residence.  The group went to pick up Sorto in Villa's mother's minivan.  Villa drove, Landin sat in the front passenger seat, and Uribe was in the back seat.

¶ 7     Villa observed Sorto walking on the sidewalk with three men following him.  According to Villa, two of the men were light-skinned Latinos with tattoos, and the other man was African American.  Villa stopped the minivan, and Uribe opened the door to allow Sorto to enter.

¶ 8     As Villa started to drive, he observed one of the three men lift his sweatshirt to reveal a black handgun tucked in his waistband.  The man did not remove the weapon from his pants. Villa recognized the individual – who had a large, bright tattoo on his neck – as "Santos." Villa and Santos had attended the same high school.

¶ 9     As Villa reached the intersection, he observed a fourth individual wearing a black hoodie and black pants, who was approximately one-half block from the other three men.  Villa testified that he recognized the fourth individual as defendant, another former high school classmate.

When asked whether the fourth individual was present in court, Villa responded "no."

¶ 10     According to Villa, defendant walked out between two vehicles, pointing a large black handgun.  Defendant commenced shooting, and Villa sped off.  Villa was shot, and he bled profusely and lost feeling in his left side.  After Villa switched seats, Uribe drove him to the hospital.  Villa was transported to a second hospital, where he had reconstructive surgery.  He was eventually diagnosed with nerve damage and post-traumatic stress disorder (PTSD).

¶ 11     After initially meeting with detectives at the first hospital on the night of the shooting, he again spoke with detectives on February 9, 2016, when he was shown a photo array at the police station.  During the video-recorded photo array, Villa identified defendant as the shooter.

¶ 12     On cross-examination, defense counsel inquired regarding a conversation between a Chicago police officer and Villa on the night of the shooting.  Villa did not recall informing the officer that the shooter was an "unknown male in a red hoodie."  He further testified that while in a bed in the first hospital, he identified defendant from a Facebook search.

¶ 13     Villa was also cross-examined regarding his relationship with Alexandra Fernandez (Fernandez).  He testified that he had a "very close" friendship with Fernandez during February 2016.  Villa denied telling Fernandez that he was not sure who the shooter was.  He further denied becoming angry when he learned that Fernandez was pregnant with defendant's child.

¶ 14     During redirect examination, Villa testified that he gave defendant's name to the detectives on the night of the shooting and pulled up defendant's Facebook page to "make it easier" for the detectives.

¶ 15                                    *Miguel Landin*

¶ 16     Landin testified that when the minivan approached Sorto, he appeared "scared" as he walked away from a "group of members that were following him."  Landin described the

3

"members" as two Latinos and one African American man. He recognized one of them as "Santos," an individual with tattoos who he knew from high school and from the neighborhood.

¶ 17    After Sorto entered the minivan, Villa continued driving. Landin then noticed an individual standing between two vehicles. He recognized the individual as defendant, whom he identified in court. Landin's testimony suggests that defendant's appearance at trial differed from the date of the incident, *i.e.*, he had gotten face tattoos, his hair was braided, and he was wearing glasses.

¶ 18    According to Landin, defendant – who was dressed in black – popped up behind a vehicle and was holding a black handgun with an extended magazine. He pointed the weapon at the minivan. Landin testified that he thought that defendant would not shoot, as Landin remembered him from high school and "he didn't really look like the type of person that does that type of stuff." Defendant repeatedly shot at the minivan, and Villa drove away. Landin testified that Villa and Sorto had been shot.

¶ 19    Landin spoke with the police at the hospital after the shooting, and he identified defendant as the shooter in a recorded photo array at the police station on February 9, 2016.

¶ 20                            *Miguel Sorto*

¶ 21    Sorto testified that in the early afternoon on January 25, 2016, he walked from Villa's residence to spend time at his girlfriend's home. When he later walked back to Villa's residence, Sorto was "being followed" by "Cesar and his friends." Sorto testified that three men – two Latinos and one African American individual – whistled at him. Sorto called Uribe and informed him that he was being followed and felt scared. As the three men continued to follow him, Sorto grew "[p]anicky" and called Uribe a second time, asking to be picked up. Sorto then

observed his friends pulling up in the minivan.

¶ 22    After entering the minivan, Sorto observed the individuals who had been following him. When asked by the prosecutor if anything was happening at that point, Sorto initially responded "[g]ang signs I believe, yeah" but subsequently testified, "I don't see them throwing gang signs." As the minivan pulled away, he observed defendant – whom he identified in court – shooting a weapon. Defendant was the only individual whom Sorto observed holding a weapon. Sorto was shot, and, as of the time of trial, a bullet remained lodged in his shoulder blade.

¶ 23    Sorto testified that he met with the police on the date of the incident and later consented to a recorded photo array, where he identified defendant as the shooter. According to Sorto, defendant did not have a face tattoo on the date of the shooting but did at the time of trial. During cross-examination, Sorto testified that he did not know who defendant was before the shooting; his friends informed him as to defendant's identity based on a photograph on Facebook.

¶ 24                              *Enrique Uribe*

¶ 25    According to Uribe, Sorto sounded scared during their initial telephone conversation. Approximately 10 minutes later, Sorto again called Uribe and asked to be picked up. Uribe testified that he did not notice anyone near Sorto as the group picked him up, but Uribe subsequently noticed three men at the corner, one of whom he recognized as "Santos." Uribe observed all three men flash gang signs.

¶ 26     As the group continued driving, another individual approached the minivan and commenced firing a weapon. Uribe testified that he did not view the shooter, as he ducked when the shooting began. Uribe was not able to identify anyone during a subsequent photo array.

¶ 27    Certain stipulations were then read into the record, including a stipulation that shell

casings and a metal fragment recovered from the scene were from the same firearm. Defendant moved for a directed finding, which the trial court denied. The sole defense witness was Alexandra Fernandez.

¶ 28                    *Alexandra Fernandez*

¶ 29    Fernandez testified that defendant is her son's father but that he was never her boyfriend. After previously dating during high school, Fernandez became pregnant during an encounter with defendant in December 2015.

¶ 30    Fernandez also knew Villa from high school and through mutual friends. On the date of the shooting, Villa sent a photograph of himself in the hospital to Fernandez through Snapchat. Fernandez and Villa commenced dating near the time of the shooting and spent time together almost every day in February 2016. According to Fernandez, Villa repeatedly stated during that time that he was not sure of the identity of his shooter.

¶ 31    During cross-examination, Fernandez testified that she did not communicate with defendant as of the date of the shooting, and defendant did not know that she was "talking" with Villa. Fernandez testified about a conversation with Villa on approximately February 20, 2016. According to Fernandez, Villa stated that he did not know who the shooter was. Villa then showed her screen shots of pictures on his phone, which included photos of defendant. Although Fernandez knew defendant, she asked Villa: "[W]ho is this guy?" Villa responded, "I think that's my shooter." Fernandez also testified that she thought that defendant's friend Santos was in the photograph.

¶ 32    Fernandez testified that she learned she was pregnant by defendant – and she informed Villa of the pregnancy – in mid-March 2016. According to Fernandez, Villa was "very heartbroken of the fact I told him I was pregnant by who he thought was his shooter," and they

subsequently ended their relationship. Fernandez later relayed to a detective that neither Villa nor defendant was aware that she knew the other until months after the shooting.

¶ 33    After Fernandez's testimony, defense counsel read a stipulation that a Chicago police officer would testify that Villa had related that he observed "an unknown male in a red top" firing a weapon.

¶ 34                                    *Conclusion of the Trial*

¶ 35    During closing argument, defense counsel contended that certain forensic evidence – *e.g.*, the location of the bullet holes in the minivan's headrest – suggested that the State's witnesses' accounts of the shooting were implausible. Defense counsel also suggested that the identifications were "contrived," as there was testimony that the witnesses "had meetings" regarding whether defendant was the shooter. After noting that Villa did not identify defendant in court, defense counsel argued that Villa had repeatedly told Fernandez that he was not certain whether defendant was the shooter but "chose him anyway."

¶ 36    In rebuttal argument, the assistant state's attorney (ASA) asserted that the testimony of Villa, Landin, Sorto, and Uribe was consistent and credible. The ASA opined that Villa was afraid to identify defendant in court and noted that Villa identified defendant in the photo array. The ASA further argued that if Villa's motive for "pinning everything" on defendant was the fact that he had impregnated Fernandez, the timing did not make sense, *i.e.*, Fernandez did not know she was pregnant until March 2016, after Villa had already identified defendant as the shooter.

¶ 37    The trial court convicted defendant of aggravated battery as to Villa and Sorto, and his motion for reconsideration and/or a new trial was denied. After the ASA read victim impact statements and the presentence investigation report (PSI) was presented – which indicated that defendant was in the Milwaukee Kings street gang – the trial court's comments during the

sentencing hearing included the following:

> "It was eventually brought to my attention through the evidence during the course of the trial that somebody out there was yelling this nonsense I refer to as gang stuff, shooting, gang stuff. Cars – people in the car, apparently one organization, someone outside the car, in this case [defendant], different organization. And I said this so many times before. Nothing illegal about being in a gang, not illegal. You want to be in let's say Milwaukee Kings, be in Milwaukee Kings. You want to be to [*sic*] the Two Six, be in the Two Six. Not being in a gang by itself that's illegal. It's what you do while you're in the gang that might be illegal, such as referring [*sic*] gang banging, shooting people or trying to (indecipherable) – opposing gang, that's gang banging. You want to be in the Royals, you want to be in the Two Six, Disciples, all of that silly nonsense stuff, that's fine, however, once you start gang banging, like in this case, shooting people in the car, that's not really legal but not something that should be done by people in opposing gangs or anybody else for that matter."

Among other things, the trial court opined that the motive for the shooting was "gang nonsense" and offered that "[t]here is only two things that can happen when you're involved in gang stuff seriously," *i.e.*, getting killed or being imprisoned.

¶ 38    The trial court sentenced defendant to consecutive terms of imprisonment of 13 years as to Villa's shooting and 12 years as to Sorto's shooting and denied his motion to reconsider sentence. The trial court then addressed defendant directly, encouraging him to "give up the Milwaukee Kings nonsense when you get out of the joint." Defendant filed this timely appeal.

¶ 39                          ANALYSIS

¶ 40    Defendant advances two primary arguments on appeal. He initially contends that he was

denied due process and a fair trial when the trial court inaccurately recalled defense evidence that "went directly to the disputed identification issue." Specifically, he argues that the trial court's decision to reject Fernandez's account and to credit Villa's identification hinged on this flawed recollection. Defendant also asserts that the trial court considered improper sentencing factors, *i.e.*, the trial court repeatedly expressed its belief that the shooting was gang-related and opined on the harmfulness of gang membership. We address each contention in turn.

¶ 41                                    *Inaccurate Recall of Defense Evidence*

¶ 42    Defendant contends that the trial court inaccurately recalled the defense evidence in three key respects. First, defendant argues that the trial court did not believe that Villa and Fernandez had discussed Villa's identification of defendant. The trial court stated, "I don't believe she talked to Villa about that whatsoever. I really don't think that happened at all." Second, defendant asserts that the trial court characterized Fernandez's testimony to contend that Villa volunteered a photograph of defendant on his phone in order to deny his identification – a story which the trial court rejected: "[I]t's rather odd to come up – that Villa has this cell phone or whatever and there is a picture on the cell phone of I believe it was Villa and [defendant] and Villa says, oh, that wasn't him that shot me." Finally, the trial court opined that even if Villa equivocated regarding his identification, it was because he was aware of Fernandez's pregnancy. The trial court stated that "it's something a person might say. Oh, I don't know if that is the guy that shot me or not. It's the father of your baby and I don't know if he shot me or not."

¶ 43    The State argues that defendant forfeited this issue where he failed to object to the trial court's findings and failed to specifically raise the issue in his posttrial motion. *People v. Jackson*, 2022 IL 127256, ¶ 15. "When a defendant has forfeited appellate review of an issue, the reviewing court will consider only plain error." *People v. Thompson*, 238 Ill. 2d 598, 611

(2010). The plain-error doctrine allows a reviewing court to consider unpreserved errors where "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 44 Defendant maintains that the issue cannot be waived or forfeited where the purportedly misapprehended evidence was argued by the defense. The State responds that where there is no error, there is no reason to consider whether a defendant's procedural default should be excused. *E.g.*, *People v. Moon*, 2019 IL App (1st) 161573, ¶ 37 (concluding that plain error review was unmerited where the trial court did not err in its recollection of the evidence).

¶ 45 The failure of a trial court to recall and consider testimony which is crucial to the defense may violate a defendant's right to due process. *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39. The trial court in a bench trial is presumed to have considered only competent evidence in reaching its verdict unless that presumption is rebutted by affirmative evidence in the record. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91. "Where the record affirmatively indicates that the trial court did not remember or consider the *crux* of the defense when entering judgment, the defendant did not receive a fair trial." (Emphasis added.) *Id.* See also *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 107 (finding that the trial court's "minor misstatement" did not affect the basis for its ruling and did not result in a mistake in the decision-making process). "Whether a defendant's due process rights have been denied constitutes an issue of law, which we review *de novo*." *Moon*, 2019 IL App (1st) 161573, ¶ 36.

¶ 46 In the instant case, we find that the trial court did not incorrectly recall any material

evidence which was crucial to the defense. Three eyewitnesses – Villa, Landin, and Sorto – independently and repeatedly identified defendant as the shooter. The trial court considered the factors outlined in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), when assessing the reliability of these identifications. See *In re J.J.*, 2016 IL App (1st) 160379, ¶ 22 (noting that the "*Biggers* factors" are used by Illinois courts for analyzing an identification's reliability). See also *People v. Harris*, 2018 IL 121932, ¶ 27 (providing that the testimony of a single eyewitness is sufficient to sustain a conviction if the testimony is credible and positive). The trial court also observed that Uribe's inability to identify defendant as the shooter belied the defense theory that the four friends had coordinated to "pin" the shooting on defendant.

¶ 47    The purported errors in the trial court's recollection all relate, directly or indirectly, to Fernandez's testimony. Based on our review of the record, none of the purported misrecollections affected the basis of the court's ruling or were crucial to defendant's defense. *E.g.*, *Williams*, 2017 IL App (1st) 150795, ¶ 39. For example, the trial court appears to have questioned the veracity of Fernandez's testimony concerning her communications with Villa regarding his identification of the shooter. As the trier of fact, however, the court had the opportunity to determine the credibility of Fernandez and the other witnesses and the weight to be afforded to their testimony. *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 59. Similarly, regardless of whether Villa volunteered the photograph of defendant on his phone or Fernandez caught sight of the photograph by chance, the fact remains that Villa had previously identified defendant as the shooter in an earlier videotaped photo array, as the trial court expressly observed. Furthermore, during the sentencing hearing, the trial court noted that Fernandez's testimony "really had no effect on my decision one way or the other." As the reviewing court, we will not substitute our judgment for that of the trier of fact on issues involving the weight of

11

evidence or the credibility of witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 48    Defendant's reliance on *People v. Bowie*, 36 Ill. App. 3d 177 (1976), is misplaced. The defendant in *Bowie*, who was charged with battery and resisting a police officer, testified, in part, that the police officer repeatedly struck his head, which caused him to bleed. *Id.* at 180. During closing arguments in the bench trial, however, the trial court remarked: "I heard nothing about *** the defendant stating anything about that he was bleeding." *Id.* Noting that the police officer and the defendant each claimed that the other began the physical altercation, the appellate court concluded that the trial judge did not "remember or consider the crux of the defense when entering judgment" against the defendant and thus reversed the convictions and remanded the matter for a new trial. *Id.* In the instant case, unlike in *Bowie*, the trial court accurately summarized the evidence presented during the trial, and none of the challenged remarks were crucial to defendant's theory of the case or likely to affect the outcome of the trial.

¶ 49    In sum, we conclude that the record – when viewed in its entirety – does not affirmatively demonstrate that the trial court relied on any of its purported misrecollections in making its determinations regarding the witnesses' credibility or defendant's guilt. See *Moon*, 2019 IL App (1st) 161573, ¶ 33. Accordingly, we find that the trial court did not err, and we need not consider defendant's argument under plain error review. We turn to the next issue on appeal.

¶ 50                    *Trial Court's Remarks Regarding Gangs*

¶ 51    Defendant contends that he was denied a fair sentencing hearing due to the trial court's consideration of improper sentencing factors. According to defendant, the trial court – without any supporting evidence – stressed that the shooting was gang-motivated and offered personal commentary on gang membership.

¶ 52    A criminal defendant has the constitutional right to a fair sentencing hearing.  See U.S. Const. amend XIV; Ill. Const. 1970, art. 1, § 2.  The imposition of a sentence normally is within a trial court's discretion, and "there is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, such that the trial court's sentencing decision is reviewed with great deference."  *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. "Nonetheless, the question of whether a court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*."  *Id.*

¶ 53    Defendant maintains that the sole gang-related trial evidence was Uribe's testimony that "people on the street standing hundreds of feet away from [defendant] flashed gang signs as their minivan passed."  Simply put, this characterization is incomplete.  Landin testified that "[t]here was a group of members" following Sorto.  His reference to "members" strongly implies that he considered these individuals to be members of a street gang.  Sorto testified that he was followed by "Cesar and his friends," suggesting a connection between the defendant (Cesar Maldonado) and the other individuals on the street.   When asked whether anyone other than defendant was in a photo which Villa pulled up on his phone, Fernandez responded, "I believe it was [defendant] and Santos" – again suggesting some connection between the two men.  In light of the testimony linking defendant to the individuals standing on the street, Uribe's testimony that those individuals flashed gang signs holds significantly more importance than defendant contends.

¶ 54    We further observe that the PSI submitted to the trial court indicated that defendant "reported that he has been affiliated with the Milwaukee Kings street gang since age 17."  The purpose of a PSI is to collect all the necessary information for the trial judge before a sentence is imposed.  *People v. Williams*, 149 Ill. 2d 467, 488 (1992).  Accord *People v. Walton*, 357 Ill. App. 3d 819, 821-22 (2005).  Viewing the evidence presented at trial together with the

information in the PSI, the trial court could reasonably find that the shooting was gang related. We further note that defendant's gang involvement was a relevant consideration in aggravation. See 730 ILCS 5/5-5-3.2(a)(15) (West 2020).

¶ 55    Defendant also contends that the trial court improperly considered its private knowledge and opinion of gangs at sentencing. Even if the trial court's remarks regarding the personal and societal impact of gang membership were ill-advised, such observations " 'are generally of no consequence where the record shows the court otherwise considered proper sentencing factors' " (*People v. Walker*, 2012 IL App (1st) 083655, ¶ 33 (quoting *People v. Thurmond*, 317 Ill. App. 3d 1133, 1142 (2000)), as was the case herein.

¶ 56    In conclusion, we recognize that "[i]t is improper for a trial court to consider that a shooting was gang related where there is no evidence that the shooting was gang related." *People v. Zapata*, 347 Ill. App. 3d 956, 964 (2004). We find, however, that there was evidence that the shooting in the instant case was gang related, and we thus conclude that the trial court did not apply an improper sentencing factor. We further observe that the aggregate sentence of 25 years imposed in the instant case was well within the applicable sentencing range. 730 ILCS 5/5-4.5-25(a) (West 2020) (providing that the sentencing range for each count of aggravated battery was 6 to 30 years). *E.g.*, *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 122 (noting the trial court's "wide latitude in sentencing a defendant to any term within the applicable statutory range").

¶ 57                                   *Motion Taken With the Case*

¶ 58    Finally, we note that the State has filed a motion for leave to file a supplemental brief. In the motion, the State argued that if this Court remands for a new sentencing hearing, the case need not be reassigned to a different judge on remand, as requested by defendant. In an order

entered on May 9, 2023, we took the State's motion with the case. Based on our disposition herein, the motion for leave to file a supplemental brief is denied.

¶ 59                                    CONCLUSION

¶ 60    For the reasons stated above, the judgment of the circuit court of Cook County is affirmed in its entirety.

¶ 61    Affirmed.