2023 IL App (1st) 220029-U

No. 1-22-0029

Order filed June 30, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 11244 |
| | ) | |
| NICKOLAS SANTOS, | ) | Honorable |
| | ) | Domenica A. Stephenson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Burke and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's cumulative 40-year sentence affirmed over his contentions that his sentence was excessive and the trial court failed to accord proper weight to his rehabilitative potential and other mitigating evidence. Cause remanded for correction of an error in the sentencing order.

¶ 2    Defendant Nickolas Santos appeals from the judgment of the trial court resentencing him upon remand to consecutive prison terms of 34 years for first degree murder and 6 years for attempted murder. Defendant argues his 40-year sentence is excessive given his rehabilitative

potential and other mitigating factors. Defendant also requests that this court remand under Illinois Supreme Court Rule 472 (eff. May 17, 2019) for correction of a clerical error in the sentencing order. We affirm, and remand under Rule 472(e).

¶ 3     Following a jury trial, defendant was found guilty of first-degree murder, attempted murder, and aggravated discharge of a firearm. The jury also found that defendant personally discharged the firearm proximately causing death to another person. Defendant was 15 years old at the time of the offenses, but was tried as an adult pursuant to the automatic transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130(1)(a) (West 2004)).

¶ 4     The trial court sentenced defendant to 45 years in prison for first-degree murder, plus a 25-year firearm sentencing enhancement for personally discharging a firearm causing death to another person. The trial court merged the aggravated discharge of a firearm count into the attempted murder count and imposed a sentence of 10 years in prison for attempted murder, to be served consecutively to the first-degree murder sentence, for a total of 80 years in prison. Defendant appealed, arguing *inter alia* that the base sentence for his murder conviction was excessive where he was only 15 years old at the time of the offense and his cumulative sentence was the functional equivalent of a natural life sentence inappropriate for someone who was a teenager at the time of the offense. This court affirmed. *People v. Santos*, 2013 IL App (1st) 111149-U. Defendant filed a petition for leave to appeal with our supreme court.

¶ 5     On March 25, 2020, the Illinois Supreme Court issued a supervisory order, directing this court to vacate our judgment and consider the effect of *People v. Buffer*, 2019 IL 122327, and *People v. Holman*, 2017 IL 120655, on the issue of whether defendant's sentence constituted a *de facto* life sentence in violation of the Eighth Amendment and *Miller v. Alabama*, 567 U.S. 460

(2012), and determine if a different result was warranted.[1] On September 11, 2020, this court vacated our 2013 decision in order to consider the impact of *Buffer* and *Holman* on defendant's sentencing claim. *People v. Santos*, 1-11-1149 (Sept. 11, 2020) (disposition order).

¶ 6    Defendant filed a motion for summary remand for a new sentencing hearing, with which the State agreed. On September 14, 2020, this court allowed defendant's motion, vacated his sentences, remanded the cause for a new sentencing hearing in compliance with *Buffer*, *Holman*, and the juvenile sentencing provisions of section 5-4.5-105 of the Unified Code of Corrections (Code) (730 ILCS 5/5-4.5-105 (West 2020)), and affirmed in all other respects. *People v. Santos*, 1-11-1149 (Sept. 14, 2020) (disposition order).

¶ 7    On remand, the trial court imposed a sentence of 34 years in prison for first-degree murder, with no firearm sentencing enhancement, and a consecutive sentence of 6 years in prison for attempted murder, for a total of 40 years in prison.

¶ 8    Because defendant's appeal relates to the sentence imposed on resentencing, we only summarize the relevant evidence adduced at trial. As reflected in our prior order addressing defendant's direct appeal, the trial evidence established that 15-year-old defendant was found guilty of the April 18, 2004, first-degree murder of Kevin Murphy, attempted murder of Chicago police officer William Grassi, and aggravated discharge of a firearm. An eyewitness, Teresa Ward, testified that she observed defendant draw a firearm and shoot Murphy twice. Ward gave a statement and identified defendant in a lineup.

---

[1] *People v. Buffer*, 2019 IL 122327, ¶ 40, deemed any sentence above 40 years imprisonment to be a *de facto* life sentence, and presumptively unconstitutional, when imposed on a juvenile. *People v. Holman*, 2017 IL 120655, ¶ 40, held that the court was to consider "youth and its attendant characteristics" when sentencing a juvenile.

¶ 9    Chicago police sergeant William Grassi testified that while he was conducting a narcotics investigation, he observed defendant and codefendant Jonathan Pena run through an alley. Grassi then moved in their same direction and heard at least two gunshots nearby. Grassi was moving through an alley when he observed defendant and Pena reenter the alley running toward him and carrying weapons. Grassi identified himself as a police officer and ordered them to drop their weapons. Defendant fired his handgun once at Grassi and Pena fired his weapon three times. Both defendant and Pena were apprehended shortly thereafter.

¶ 10   Chicago police detective Tracy Fanning interviewed defendant on April 19, 2004. Defendant told Fanning that he "hooked up with" Pena, who carried a silver firearm and told defendant "let's go get somebody." Defendant explained that Pena wanted to shoot a Cobra or a rival gang member. Defendant and Pena entered Cobra area and encountered Murphy sitting on a porch. Murphy said "Cobra folk" or "what up folk," and Pena responded by calling him "Cobra killer" and shooting him. Pena moved closer, shot Murphy twice, and then fled with defendant. They exchanged gunfire with an officer in an alley before they were apprehended.

¶ 11   Assistant State's Attorney Dan Tiernan testified that he informed defendant during an interview that he had been identified as the shooter. Defendant then told Tiernan that while he was at Pena's house, Pena came out of his house with a firearm and said "let's go get some Cobras," members of a rival gang. Defendant and Pena walked to an area where they observed Murphy sitting on a porch. At that point, defendant asked Pena for the firearm because he wanted to prove that he was tough. Pena gave him the firearm. Murphy exchanged words with Pena, and defendant shot Murphy at least two times before fleeing with Pena. They encountered a police officer in an

alley, and defendant fired once at the officer. Defendant and Pena were apprehended soon thereafter.

¶ 12 The jury found defendant guilty of the first-degree murder of Murphy, attempted murder of Grassi, and aggravated discharge of a firearm. The jury also found that defendant personally discharged the firearm proximately causing Murphy's death.

¶ 13 The trial court sentenced defendant to 45 years in prison for first-degree murder, plus a 25-year sentencing enhancement for personally discharging a firearm that proximately caused death, and to a consecutive sentence of 10 years in prison for attempted murder, into which the court merged the aggravated discharge of a firearm count, for a total of 80 years in prison.

¶ 14 This court affirmed the judgment and sentence on direct appeal. *People v. Santos*, 2013 IL App (1st) 111149-U. Pursuant to our supreme court's supervisory order, we vacated that judgment (*People v. Santos*, 1-11-1149 (Sept. 11, 2020) (disposition order)) and subsequently vacated defendant's sentences, remanded a new sentencing hearing in compliance with *Buffer*, *Holman*, and section 5-4.5-105 of the Code, and affirmed in all other respects (*People v. Santos*, 1-11-1149 (Sept. 14, 2020) (disposition order)).

¶ 15 On remand, a new presentence investigation (PSI) report was ordered. The PSI reflects that defendant was 32 years old at the time of resentencing. According to the PSI, defendant expressed he had a good relationship with his parents and three siblings. His parents separated when he was 12 years old, and he lived with his mother. Defendant denied any type of abuse or neglect during his childhood. He had a tight bond with his father, and "his life took a downward turn when his father left." His mother suffered from mental health issues and was unable to be there for him as much. Defendant indicated he had been in a relationship with his girlfriend, Cecilly Paz, for 12

years, and planned to live with her when he was released. Both his girlfriend and father were supportive of him.

¶ 16    Defendant completed middle school and one semester of high school before he was "locked up." Since his incarceration, he completed his GED in 2008 and was on a waitlist to attend college.

¶ 17    The PSI reflected that defendant had no prior criminal history. Defendant denied all gang involvement, though he was identified by the LEADS system as possibly affiliated with a gang. He had no history of mental or physical health issues. Defendant reported using marijuana several times a week and drinking alcohol a couple of times a week, from the ages of 14 to 15.

¶ 18    Defendant reported feeling bad and takes " 'no pride' " in his criminal behavior. He expressed concern about the problems of other individuals and he "sometimes lacks control" over events in his life.

¶ 19    In advance of the resentencing hearing, defendant filed a sentencing memorandum, addressing the considerations pronounced in *Buffer*, as well as a "mitigation packet," which included letters from family members and friends. Emmanuel Santos, defendant's younger brother, wrote that defendant had been gifted in sports and had served as a mentor to both him and his baseball teammates. Noel Santos, defendant's older brother, wrote that defendant was a "take action character" and had taken care of their aging grandfather. A letter authored by defendant's cousin, Lamario Duncan, stated that defendant had taken care of his brothers and grandfather, and that his athletic abilities allowed him to display responsibility from an early age. Gabriela Reyes, another cousin, wrote that she and defendant had grown up like siblings, he taught her to play baseball, they spoke on the phone weekly, and he was her "counselor, brother, coach, and best friend."

¶ 20    Defendant's friend, Mariano Reyes, wrote that defendant was gifted in many ways. Reyes believed that defendant would use these gifts to better the world and prevent others from repeating his mistakes for which he felt great remorse. Defendant's former baseball coach, Nelson Perez, wrote that defendant excelled at sports and as a leader, but Perez had noticed a change in defendant following his parents' divorce. Avril Greenberg and Adriano Bruzzone from the Recipe for Change program both wrote that defendant was an active and eager participant in the program. Greenberg asserted that defendant was attentive and committed to his work and to changing his life. Bruzzone noted defendant's positive attitude and that he got along well with his co-workers. Fellow inmate Cecil Ross wrote that defendant had been assigned to mentor him in prison, and defendant had gone above and beyond in his role and had also taken the time to help Ross on a personal level.

¶ 21    In addition to the letters, the mitigation packet included three paintings by defendant, GED transcripts, work and educational certificates he earned in prison, and a positive performance evaluation from his employment in prison.

¶ 22    At the sentencing hearing, the State called Illinois Department of Corrections (IDOC) Lieutenant Christopher Milsap to testify. Milsap worked with the "intel" department and his duties included monitoring the facility's inmate population. Milsap explained that a "ticket" is an infraction, and inmates could receive major or minor tickets for infractions. Major infractions included participating in gang activity, drugs, and "things of that nature."

¶ 23    Milsap reviewed defendant's file and testified that defendant had been found guilty of six major tickets during the nearly ten years he had spent in prison and had received punishment for the infractions. In 2011, defendant pled guilty to gang or unauthorized organizational activity

relating to a note found on a bunk bed and to possession of contraband or unauthorized property. In 2012, he pled guilty to possession of contraband and to misuse or damage of property after a six-inch piece of sharpened metal was found inside an oatmeal box in his cell.

¶ 24 In 2014, defendant was found guilty of a ticket for "unauthorized movement." In 2016, he was found guilty of a ticket alleging he had accepted a leadership position in a gang in his cell house. His grievance appealing the finding was denied. Later in 2016, defendant pled guilty to a ticket for possession of contraband, consisting of altered headphones. In 2017, defendant was found guilty of possession of intoxicants and possession of contraband, a needle hidden in his bunk.

¶ 25 Milsap stated that defendant held only one job while in IDOC, working as floor maintenance from September 2018 to September 2019. Defendant had taken a construction "tech" class from December 2019 until his transfer to another facility for resentencing in September 2020 and was unable to complete the course.

¶ 26 On cross-examination, Milsap testified that an inmate's length of sentence was a factor considered when granting inmates educational opportunities. However, he disagreed that inmates with longer sentences were unable to participate in educational activities, because inmates could go through their counselors to attend classes. Milsap stated that the 2016 ticket for taking a gang leadership position was based on information from two confidential informants. None of the six tickets involved physical violence, and defendant had not received any tickets in the four and a half years prior to the hearing.

¶ 27    Defendant presented the testimony of his father, Luis Santos.[2] Luis testified that both he and defendant's mother were abusive towards defendant and disciplined him physically. They wanted defendant to excel at sports so they punished him when he lost, believing that being an athlete was "the only ticket he had to get out of the area we lived in." Luis "held nothing back" when disciplining his sons. After Luis and defendant's mother separated and Luis left the home, he did not contact his children. Defendant would occasionally try to find Luis, but Luis "abandoned" him. Defendant helped his family, excelled at sports, and tutored other children; this case was the only time he ever got in trouble with the law.

¶ 28    Paz testified that she had known defendant since she was 11 years old, and they dated in elementary school. She described him as "intelligent" and "athletic, very wise, and very humble." He had been an excellent student and was in "the smart class." She remained in contact with defendant after his incarceration. Paz noted that there was a shift in defendant after his father left home, and he had lacked guidance. On cross-examination, Paz testified that she did not consider herself defendant's girlfriend, but he would live with her when he was released.

¶ 29    April Greenberg, who was a program manager and educator for Recipe for Change in Cook County Jail, testified that defendant was "an amazing part" of the program and mentored other students. He was sincere about changing his life and was committed to his work.

¶ 30    In aggravation, the State argued that defendant's recent participation in educational and work activities was only to "look favorable to the court." The State further argued that defendant had planned to kill a Cobra, deliberately entered Cobra territory, and only pulled the trigger after

---

[2] We will refer to Luis Santos by his first name to prevent confusion as he shares a surname with defendant.

confirming that Murphy was a Cobra. The State asserted there was no evidence of outside pressure to commit the crime. The State argued that Luis' testimony was unbelievable and contrary to what defendant reported given that neither the new nor original PSI made any mention of abuse at home. Rather, defendant reported he had a good relationship with his family and never suffered physical or emotional abuse. The State maintained that, though defendant had rehabilitative potential, he had only shown an interest in becoming a "productive member of society" "recently," in the preceding year or so. The State reiterated that defendant was the main participant in the shooting, and had been originally sentenced to 80 years in prison. The State requested that the court impose the maximum sentence within the parameters of *Buffer*.

¶ 31     In arguing mitigation, defense counsel placed emphasis on the following three mitigating factors: (1) defendant's conduct was facilitated by another person; (2) defendant's lack of prior criminal history; and (3) defendant's conduct was the result of circumstances unlikely to recur. Counsel pointed to defendant's young age at the time of the offenses, the pressure of the older Pena's influence, and defendant's home environment. Defendant had made strides to change, and had not received any new tickets in four years. None of defendant's tickets were for physical violence and he possessed an excellent work ethic, evidenced by his numerous certificates and art skills. Defendant also had no prior juvenile or criminal history.

¶ 32     Counsel argued that defendant went into a downward spiral after his parents separated, and that multiple people had observed a change in him at that time. There was no evidence that defendant was still in a gang, and he had made "huge strides" while incarcerated. Counsel argued that defendant had spent more of his life in prison than out of it, and that "a life should not be

defined by just a single day." Counsel requested a sentence "on the lower end" and asked the court to exercise its discretion and not apply the firearm enhancement.

¶ 33 In allocution, defendant apologized to his family and friends and to Murphy's family. He stated that he was an innocent man, and he had never shot a firearm in his life. He made a mistake by hanging around with the wrong people and admitting to something he did not do. Defendant had a new perspective on life and struggled knowing that he was unlikely ever to go home. He "lived to survive" in prison and never brought physical harm to anyone. Defendant believed he had a lot to offer and wanted to go back to his family. He asked for the minimum sentence and said he would make the best of it, if given the chance.

¶ 34 Following the hearing, defendant filed a supplement regarding the prison's educational training opportunities, pointing to the prison waitlist policy that prioritized inmates who were released soonest. The supplement also asserted that the facility where defendant was serving his sentence did not offer college level courses or vocational training.

¶ 35 In announcing sentence, the court stated it heard all of the testimony and arguments in aggravation and mitigation and considered the PSI report, defendant's sentencing memorandum, defendant's supplement regarding educational training, this court's mandate, and "all of the statutory factors in aggravation and mitigation." The court referenced section 5-4.5-105 of the Code and stated that it was to consider those factors due to defendant's age of 15 years old at the time of the offense. The court noted the shooting was not "a sudden or impulsive decision" by defendant. It cited testimony of defendant's intelligence and found that there was no evidence that defendant was unable to consider the risks and consequences of his actions.

¶ 36    The court found there was no evidence that defendant was subject to outside pressure or peer pressure, noting defendant "asked for a gun so he could prove how tough he was" and he did so "of his own free will." The court acknowledged that while Pena may have been a negative influence, he never forced defendant to take the firearm, and it was defendant's decision to ask for the firearm and shoot the victim. The court also found that defendant's father's testimony regarding defendant's home life contradicted the PSI, but considered that there was an observed shift in defendant after his father left.

¶ 37    Regarding rehabilitation, the court recognized that defendant was very good at the art classes he was taking and had completed his GED while incarcerated. The only ticket that the court found concerning was the one issued for defendant's taking a leadership position in a gang, which the court found "more aggravation than mitigation." The court also noted that defendant had a job while incarcerated from September of 2018 to September of 2019.

¶ 38    The court described the circumstances of the offense, noting defendant was the shooter and asked Pena for the firearm "to prove that he was tough." The court found defendant's actions indicated a "complete disregard for human life." The court did not know of any prior criminal history for defendant. The court found that defendant was "still not taking responsibility for his actions on that day." The court's impression was that defendant made his statement in allocution for the benefit of his family in court that day and stated that defendant "showed absolutely not one ounce of remorse for what had happened, even after 17 years." The court recounted that defendant put two bullets in the victim, one in his body and firing one close-range to his head.

¶ 39    In considering the statutory factors in aggravation, the court found that defendant's actions caused serious harm. The court noted the offense was committed as part of gang activity and

defendant knowingly shot at a police officer. The court determined that the minimum sentence was inappropriate, because it would diminish the seriousness of the offense and defendant's involvement.

¶ 40    The court stated that it considered *Holman* and *Buffer* and sentenced defendant to 34 years in prison for first-degree murder and a consecutive sentence of 6 years in prison for attempted murder, for a total sentence of 40 years in prison. The court declined to impose the firearm sentencing enhancement.

¶ 41    Defendant filed a motion to reconsider the sentence, arguing the sentence was excessive because the court failed to find any mitigation and gave inadequate consideration to his rehabilitation potential and that the conduct was unlikely to recur. Defendant also argued that the trial court improperly construed the circumstances of the offense factor against defendant where that factor should be applied in mitigation only. The trial court denied the motion, noting it had considered defendant's age and "all of the mitigating factors per the statute." The court further explained that while defendant did exhibit "some" rehabilitative potential or capability regarding his art and employment, he did not demonstrate great rehabilitative capability because he did not get a job until 2018. At defendant's request, the trial court exercised its discretion and granted defendant 91 days credit for completing the Recipe for Change program. Defendant timely appealed.

¶ 42    On appeal, defendant contends his 40-year sentence is excessive. He argues his sentence fails to reflect his excellent rehabilitative potential and other factors in mitigation, asserting that the court minimized the juvenile mitigation factors as they applied to him. Defendant acknowledges that, with eligible good-time credit, he faces a sentence of 39.1 years in prison,

which is below the maximum permissible sentence for juveniles who are not beyond rehabilitation. See *Buffer*, 2019 IL 122327, ¶ 40.

¶ 43    The Illinois Constitution provides that a trial court shall impose a sentence balancing "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The trial court has broad discretion when imposing a sentence. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). The trial court is afforded "substantial deference" in sentencing because it personally observed the defendant and the proceedings, and is "in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36.

¶ 44    Where a defendant challenges a sentence within the statutory limits for the offense, this court will not disturb it absent an abuse of discretion. *People v. Burton*, 2015 IL App (1st) 131600, ¶¶ 35-36. In the sentencing context, an abuse of discretion occurs when a sentence is "manifestly disproportionate to the nature of the offense." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50. A reviewing court will not substitute its judgment for that of the trial court merely because it would have weighed the sentencing factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 45    The presence of mitigating factors or an absence of aggravating factors does not mean that the minimum sentence must be imposed. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). The most important factor in fashioning an appropriate sentence is the seriousness of the crime. *Id*. A defendant's rehabilitative potential is only one factor to be considered by the trial court, and it is not entitled to more weight than any other factor. *People v. Evans*, 373 Ill. App. 3d 948, 968 (2007). A trial court is not required to articulate every factor it considered to justify its sentence. *People v. Ramos*, 353 Ill. App. 3d 133, 137-38 (2004).

¶ 46    The sentencing range for first-degree murder is 20 to 60 years in prison. 730 ILCS 5/5-4.5-20 (West 2020).  The sentencing range for attempted murder, a Class X felony, is 6 to 30 years in prison. 720 ILCS 5/8-4(c)(1); 730 ILCS 5/5-4.5-25(a) (West 2020). If, in committing first degree murder, the offender personally discharged a firearm that proximately caused death, a 25-year to natural life prison term shall be added to the term of imprisonment. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020).  However, where a defendant was under the age of 18 at the time of the offense, the court, at its discretion, may decline to impose a firearm sentencing enhancement for personally discharging a firearm that proximately caused death to another person. 730 ILCS 5/5-4.5-105(b) (West 2020).

¶ 47    On resentencing, the court imposed a 34-year sentence for first-degree murder, which was within and toward the lower end of the 20 to 60 year sentencing range for that offense. The court recognized the firearm sentencing enhancement was not mandatory for juvenile offenders and exercised its discretion by declining to impose it. 730 ILCS 5/5-4.5-105(b) (West 2020); see *People v. Hunter*, 2017 IL 121306, ¶ 54. The court imposed the six-year minimum sentence for attempted murder, to be served consecutively to the first-degree murder sentence.  See 730 ILCS 5/5-8-4(d)(1) (West 2020) (a defendant faces consecutive sentences where, as here, one of the offenses was first-degree murder). Defendant's 34-year sentence for first-degree murder and consecutive 6-year sentence for attempted murder fell within the statutory sentencing ranges and are, therefore, presumed proper unless defendant affirmatively shows otherwise. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 48    To demonstrate such a showing, defendant argues that the trial court placed insufficient weight on his excellent rehabilitative potential and other mitigating factors afforded to juveniles in fashioning his 40-year sentence.

¶ 49    Along with considering general statutory mitigating and aggravating factors in sentencing a defendant (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2020)), additional mitigating considerations are afforded to juveniles. Section 5-4.5-105(a) of the Code requires the trial court to also consider the following factors in mitigation when sentencing someone who was under the age of 18 at the time the offense was committed:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2020).

When determining whether the trial court properly fashioned its sentence, we must consider the record as a whole, rather than focusing on a few words or statements made by the court. *People v. Walker*, 2012 IL App (1st) 083655, ¶ 30.

¶ 50     After reviewing the record as a whole, we conclude that defendant has failed to demonstrate that the court abused its discretion in fashioning his sentence on remand. We note that the new PSI set forth relevant mitigating evidence documenting his good familial relationships and rehabilitative potential, as demonstrated by his completion of his GED and being on the waitlist to attend college. Further, defense counsel argued the applicability of the relevant section 5-4.5-105(a) mitigation factors, and the mitigation package included letters submitted on defendant's behalf and other documentation weighing in favor of rehabilitation, such as defendant's GED certificate and information regarding his participation in educational classes and certificates earned. The law is well-established that where, as here, mitigating evidence is presented to the trial court, "it is presumed, absent some indication to the contrary, other than the sentence itself, that the court considered it." *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 51     Moreover, the trial court's statements show that the court considered the relevant mitigating sentencing factors and evidence in detail, and balanced that evidence against the evidence in aggravation as to the seriousness of the offense. The court was also clearly mindful that the case was before it on remand for resentencing due to defendant's age at the time of the

offense, noting this court's directive on remand and explicitly stating that it had considered *Holman* and *Buffer*. As to defendant's age and maturity at the time of the offense, the court noted that the offenses did not stem from "a sudden or impulsive decision" and there was no evidence that he was unable to consider the risks and consequences of his behavior. The court noted that there may have been "pressure to impress" and "prove that he was tough," but defendant requested the firearm and there was no evidence that Pena had pressured defendant to take the firearm or shoot Murphy.

¶ 52 The court recounted that defendant had made some strides to better himself during his incarceration and had not received any tickets for physical violence, but it found concerning his 2016 ticket for engaging in gang leadership while incarcerated, particularly given the context of the shooting death of Murphy. The court found Luis's testimony of physical abuse toward defendant contradicted by the PSI, but noted there was evidence that defendant had changed after his father left the household. In aggravation, the court recounted that the shooting caused serious harm, related to gang activity, and defendant shot at a police officer. The record therefore demonstrates that the court considered the additional statutory mitigation factors applicable to juveniles, and the cumulative 40-year sentence was not merely the automatic imposition of a sentence compliant with the 40-year cutoff for a juvenile's *de facto* life sentence under *Buffer*.

¶ 53 Although defendant claims his cumulative 40-year sentence was excessive in light of his excellent rehabilitative potential and relevant mitigating factors, a defendant is not entitled to a minimum sentence simply because mitigating evidence exists. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. Likewise, defendant's rehabilitative potential and other mitigating evidence are not

entitled to more weight than the seriousness of the offense, which is the most important factor. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11.

¶ 54 Defendant asserts that the sentencing factors in mitigation "were not fairly considered or adequately weighed" by the trial court as his sentence was near the maximum permissible sentence under *Buffer*, but we will not reverse the sentencing court just because the relevant factors in mitigation could have been weighed differently. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 28; *Burton*, 2015 IL App (1st) 131600, ¶¶ 36, 38 (defendant failed to make any affirmative showing that the trial court did not consider the relevant mitigation factors).

¶ 55 In this case, we do not find defendant's 34-year sentence for first-degree murder and 6-year consecutive sentence for the attempted murder of a police officer, which were within the applicable statutory sentencing ranges for the offenses, at variance with the spirit and purpose of the law or manifestly disproportionate to the seriousness of the offense. See *People v. Stacey*, 193 Ill. 2d 203, 210 (2000); *Burton*, 2015 IL App (1st) 131600, ¶ 36. Accordingly, the trial court did not abuse its discretion in sentencing defendant, and we affirm defendant's cumulative sentence of 40 years in prison.

¶ 56 Defendant also requests—and the State agrees—that the case be remanded for the limited purpose of allowing him to request correction of a clerical error in the sentencing order, which incorrectly states defendant was convicted of first degree murder on count VII when the conviction was for attempted murder.

¶ 57 Illinois Supreme Court Rule 472(a)(4) (eff. May 17, 2019) provides that the circuit court retains jurisdiction to correct sentencing errors, including "[c]lerical errors in the written sentencing order *** resulting in a discrepancy between the record and the actual judgment of the

court. Rule 472(e) further provides that, when the issue is raised for the first time on appeal, this court "shall remand to the circuit court to allow the party to file a motion pursuant to this rule." See Ill. S. Ct. R. 472(e) (eff. May 17, 2019).

¶ 58    We agree with the parties that the trial court's oral pronouncement shows it sentenced defendant to 34 years in prison on count V for murder and six years in prison on count VII for attempted murder but the sentencing order identifies both counts V and VII as first-degree murder. Pursuant to Rule 472(e), we remand to the circuit court to permit defendant the opportunity to file a motion to correct the clerical error in the sentencing order.

¶ 59    For the foregoing reasons, we affirm the judgment of the circuit court and remand pursuant to Rule 472(e).

¶ 60    Affirmed and remanded.